Green v. Weller et al.

———•◦•———

WILLIAM M. GREEN v. R. H. WELLER et al.

1. CONSTITUTION : RULES OF CONSTRUCTION.—" The rules which prevail in the construction of statutes, apply generally to the construction of written constitutions."

2. STATUTES : CONSTITUTION : CONSTRUCTION OF.—The true sense in which words are used in a statute, is to be ascertained generally by taking them in their ordinary and popular signification; or, if they be terms of art, in their technical meaning.

3. SAME.—It is a cardinal rule of construction, that the intention of the legislature is to be deduced from the whole and every part of the statute taken together—from the words and the context—and such a construction adopted as will best effectuate the intention of the law-giver.

4. SAME.—When it appears that the framers of a statute have used a word in a particular sense generally in the Act, it will be presumed that it was intended to be used in the same sense wherever it occurs in the Act, unless the intention to give it a different meaning plainly appears in the particular part alleged to be an exception to the general meaning indicated.

5. SAME.—The statute itself furnishes the best means of its own exposition, and if the sense in which words were intended to be used can be clearly ascertained, from all its parts and provisions, the intention thus indicated shall prevail, without resorting to other means of aiding in the construction.

6. CONSTITUTION : CONSTRUCTION OF : MEANING OF "BRANCH" AND "HOUSE."—The Constitution of this State, (§ 15, art. 3,) provides that a majority of each house shall constitute a quorum to do business; and that each house shall judge of the qualification and election of its own members; each house may determine the rules of its own proceedings (§ 16); shall keep a journal of its proceedings (§ 17); vacancies in either house shall be filled by new elections (§ 18); each house

Green *v.* Weller et al.

may punish for disorderly behaviour in its presence (§ 20); the doors of *each house* shall be opened, &c. (§ 21); *neither house* shall, without the consent of the other, adjourn for more than three days (§ 22); bills may originate in *either house*, shall be read in *each house*, and having passed both houses shall be signed, &c. From these and other provisions, it is evident that the term *house* means one branch of the legislature as contradistinguished from the other, and that a majority of the entire members composing the body constitute, in legal contemplation, the *house* or *branch* of the legislature, and that this is the general sense in which it is used in the Constitution; and therefore it must be taken in that sense in all cases wherever it is used in that instrument, unless there be something in the context which indicates a different meaning.

7. SAME.—There is nothing in the context of that clause of the Constitution, which prescribes the mode in which it shall be altered or amended, which indicates that the framers of that instrument intended to use the terms "house" and "branch," therein employed, in a different sense from the general signification applied to it in the Constitution; nor is there anything in the subject-matter from which such different signification can be inferred. On the contrary, the right to change or abolish the form of government under which they live, being inherent in a free people; and as the legislature can only propose amendments for their approval or rejection, the provision of the Constitution in question should receive such construction as would secure the exercise of this right to the people, as free and untrammelled as possible; it is sufficient, therefore, if an act, proposing an amendment to the Constitution, receive on its several readings in each branch of the legislature, two-thirds of a quorum present and voting.

8. STATUTES: LEGISLATIVE ROLLS: EFFECT OF.—The enrolled acts of the legislature, when signed by the speaker of the house of representatives and president of the senate, and approved by the governor, and deposited in the office of the secretary of state, like the parliament rolls in England, are records, and import absolute and uncontrollable verity. They are conclusive evidence of the due enactment of the statutes contained in them, and cannot be impeached in any manner whatever.

9. SAME: JOURNALS OF THE LEGISLATURE.—The journals of the two houses of the legislature are memorials of their proceedings, but they do not import absolute verity, and are not conclusive of the facts stated in them. 1 Phil. Ev. 2106; 1 Greenl. Ev. §§ 481, 482.

10. SAME.—Even if it were competent to show, by extrinsic evidence, that an Act verified and attested, and enrolled according to the form of the Constitution, had not been passed as it appeared by the record to have been passed; yet the courts cannot take judicial notice of the journals of the legislature, in order to ascertain the true state of facts; they would have to be proven by an examined copy.

11. CONSTITUTION: CHANCERY AMENDMENT.—The Act of March 2d, 1854, having received on its several readings, in each house, the assent of two-thirds of the members present and voting, being a quorum, and having been enrolled and signed by the speaker of the house of representatives and president of the senate, and approved by the governor, and deposited in the office of the secretary of state, was constitutionally enacted as a proposition to amend the Constitution; and having

subsequently been ratified by the people and inserted by the legislature of 1856, in the Constitution, is now a part of that instrument.

12. CONSTITUTION: RULES OF CONSTRUCTION.—In construing statutes or written constitutions, the main object in all cases, is to ascertain the true meaning or intention of the law; and whenever that intention can be indubitably ascertained, courts are bound to give it effect. Per SMITH, C. J.

13. SAME.—A primary rule of construction is, that the intention of the author is to be collected from the words used, taken in their ordinary and familiar acceptation; but when the words used are not so plain and explicit as to be understood without a resort to construction, then the intention may be gathered from the subject-matter and the object of the provision under consideration. Per SMITH, C. J.

14. SAME.—A rule of construction peculiarly applicable to written constitutions, is, that one provision must be construed with reference to, or in connection with the others, so that full, complete, and harmonious action may be given to all of them; and to do this, the language of any particular clause is not alone to be looked to, but the intention of the framers is to be deduced from the whole, and every part taken together. Per SMITH, C. J.

15. SAME.—Where words or phrases are used in one part of a statute or written constitution in a plain and manifest sense, they are to receive the same interpretation when used in every other part, unless it manifestly appears from the context or otherwise, that a different meaning was intended to be applied to them. Per SMITH, C. J.

16. SAME.—In construing statutes (or written constitutions,) whenever it appears that the legislature or convention has used words of a plain and definite import, it would be very dangerous to put upon them a construction which would amount to holding that the framers of the law did not mean what they had expressed. The safest course, in all cases where the intention of the legislature or convention is brought into question, is to adhere to the words of the statute or Constitution, construing them according to their nature and import, in the order in which they stand in the Act. Per SMITH, C. J.

17. SAME: "BRANCH" AND "HOUSE:" MEANING OF.—The terms "branch" and "house," as having a fixed and definite constitutional meaning, are first used in article 4, § 3, of the Constitution of this State, which declares that "the legislative power of the State shall be vested in two distinct branches, one to be styled the Senate, and the other the House of Representatives," &c.; and they here manifestly mean, not a part of the representatives or senators, but the whole of the constituent members of the respective houses or branches of the legislature. In § 15 of same article, which provides "that a majority of each house shall constitute a quorum," &c., they are used in the same sense. So in § 18 of same article, providing for the filling of vacancies which may occur in either house; and in § 27, article 4, which authorizes the governor to remove judges on the joint address " of two-thirds of both houses;" and in § 15, article 5, which provides for the passage of a bill over the veto of the governor, " by a vote of" two-thirds of each house; and in § 8, article 7, which prohibits the appropriation of money for internal improvements, except by a vote of "two-thirds of both branches;" and in § 9 of same article, which prohibits the borrowing of money on the faith of the State,

Green *v.* Weller et al.

unless the law is assented to by a majority of the members of both branches of two successive legislatures. And these terms being so used in this plain and manifest sense in every department of the Constitution, they should receive the same interpretation in all other cases where they are used in that instrument, unless it manifestly appear from the subject-matter of the provision, the context, or the object of the framers of the Constitution, that a different or qualified signification was intended to be applied to them. Per SMITH, C. J.

18. SAME.—In some of the sections of the third article of the Constitution, the terms "house" and "branch" are used to designate a *quorum*, or simple majority of the members, as in § 16, "each house may determine the rules of its own proceedings," &c. So in § 20, "each house may punish, by imprisonment, during the session, any person not a member, for disorderly behaviour," &c.; and also in §§ 22, 23, 24, which provide regulations for the adjournment of the houses, and for the introduction, amendment, alteration, and passage of bills; but in these, as in every other instance in which the term "house" or "branch" is used in a qualified sense, as implying only a *quorum* or simple majority, the action of the house is limited to subjects of ordinary legislation—to the preservation of good order, and to matters connected with its own organization. Per SMITH, C. J.

19. SAME.—The right to amend or alter the Constitution, is not embraced in the general grant of legislative power made to the two branches of the legislature; the authority to do so is derived from the special grant in the Constitution, and its exercise must be in strict conformity with the terms of the grant, or it will be null and void. Per SMITH, C. J.

20. CONSTITUTION: HOW AMENDED.—The Constitution of this State provides that, "whenever two-thirds of each branch of the legislature shall deem any change, alteration, or amendment necessary to this Constitution, such proposed change shall be read and passed by a majority of two-thirds of each house respectively, on each day, for three several days; public notice thereof shall then be given by the secretary of state, at least six months preceding the next general election, at which the qualified electors shall vote directly for or against such change, alteration, or amendment; and if it shall appear that a majority," &c., "shall have voted for such change, alteration, or amendment, then it shall be inserted by the next succeeding legislature as a part of the Constitution, and not otherwise." It is essential, in order that a valid amendment or change of that instrument be made, under the power thus vested in the legislature, that two-thirds of the whole number of the members of each house shall vote in favor of the same on three several days—there being nothing in the context, the subject-matter, or object of the framers of the Constitution, so far as relates to this clause, from which it can be inferred that they intended to use the terms "branch" and "house" in a different sense from that in which it is first used in that instrument, and subsequently in all the departments of the Constitution; but on the contrary, as the power thus vested does not pertain to the ordinary business of legislation, and as an amendment or change of the fundamental law of the State should never be made for light and trivial causes, but always with the utmost caution and care, the clause in question should receive that construction which would secure deliberation, and a concurrence of a greater proportion of the two houses. Per SMITH, C. J.

Green *v.* Weller et al.

21. COMMON LAW: HOW FAR IN FORCE HERE.—The principles of the common law, unsuited to our condition or repugnant to the spirit of our government, are not in existence in this State.    It required no positive act of legislation to repeal them— they are excluded by the silent operation of our institutions.    *Vicksburg & Jackson R. R. Co.* v. *Patton*, 31 Miss. R. 156.    Per SMITH, C. J.

22. STATUTES : EVIDENCE : PARLIAMENT ROLLS.—The public acts of the parliament of Great Britain, after they have received the royal assent, are transcribed upon parchment rolls, certified by the clerk of parliament, and deposited in the rolls office in chancery.    And when so certified and enrolled, are records, and import evidence of the highest and most absolute character, and cannot be brought in question in any court.    Per SMITH, C. J.

23. STATUTES : LEGISLATIVE ROLLS, EFFECT OF.—In Great Britain there is no written fundamental law defining and limiting the powers of parliament, and by which the validity of its acts may be tested ; but on the contrary, it is an universally received doctrine in that country, that the parliament, in a political and legis- lative sense, is omnipotent and uncontrollable ; and hence results the principle of the common law affirming the absolute verity of the parliament rolls.    But in this country, the acts of the legislature are valid only so far as they conform, both as to their subject-matter and the mode of their enactment, to the Constitu- tion, which is the supreme law of the land.    And, since a statute which, either by its provisions on its face, or in the mode of its enactment, violates the Constitu- tion, is not law, it is the right and duty of the judiciary to determine upon its validity, and if it do not conform to the Constitution in both respects, to declare it null and void; and this duty and right necessarily confers the power on the courts to judge, as well of the regularity of its passage, as of the conformity of its provisions with the Constitution.    Per SMITH, C. J.

24. SAME.—The enrolled Acts of the Legislature of this State, when signed by the speaker and president of their respective houses, approved by the governor, and deposited with the secretary of state, are *prima facie* evidence of the ex- istence of the statutes, and that they were regularly and constitutionally passed by the legislature ; but they are not conclusive,—nor is the legislative rolls the only evidence of the existence of a statute.    Per SMITH, C. J.

25. STATUTES : JOURNALS OF THE LEGISLATURE.—The Constitution enjoins upon each branch of the legislature to keep and publish a correct journal of its pro- ceedings.    The journals being made up under the direct supervision of the re- spective houses, are records of the most conclusive character, and the best evi- dence of the proceedings of the legislature ; and they may be consulted by the courts, *ex officio*, to ascertain whether an alleged statute contained in the legisla- tive rolls has been constitutionally enacted; and if it appear from an inspection of the journals that the provisions of the Constitution were not complied with in the passage of the Act in question, it is the duty of the courts to declare it null and void.    Per SMITH; C. J.

26. CONSTITUTION : CHANCERY AMENDMENT.—The Act of the 2d March, 1854, pro- posing an amendment of the Constitution, in relation to the Chancery Court, having failed to receive, in one of its readings in the senate, the vote of two- thirds of all the members of that branch of the legislature, as appears by the senate journal, was not passed in conformity with the provisions of the Constitution, and is, therefore, null and void, and no part of the Constitution.    Per SMITH, C. J.

APPEAL from the Superior Court of Chancery. Hon. Charles Scott, chancellor.

The legislature of this State, in the year 1854, passed an act proposing to amend the Constitution by abolishing the Superior Court of Chancery and establishing "chancery courts, with full jurisdiction in matters of equity, to be held in each judicial district by the circuit judge thereof, at such times and places as may be directed by law." The proposed amendment also provided for the continuation of the then chancery courts, until the first Monday of November, A. D. 1857, for the disposition of causes then pending in them.

This act, as appears by the journals of the legislature, was read on three several days, in the house of representatives, and on each reading received in its favor the votes of two-thirds of all the members of that body.

In the senate it was also read the number of times required by the Constitution, and on two of its readings, was assented to by two-thirds of all the senators, but on the other reading it was voted for by only twenty-one of the thirty-two senators who composed the senate ; it however received more than two-thirds of all the votes cast. The act was duly enrolled and signed by the speaker of the house of representatives and president of the senate, approved and signed by the governor, and thus attested, was deposited in the office of the secretary of state.

The proposed amendment having been submitted to the people at the general election in November, 1855, was ratified by them, and on the 6th day of February, A. D. 1856, was inserted by the legislature as a part of the Constitution. On the 19th day of the same month, the legislature passed an Act, in pursuance of the amendment, conferring equity jurisdiction on the several circuit courts of the State.

On the 14th day of February, 1856, Wm. M. Green, the appellant, filed his original bill in the Superior Court of Chancery, seeking relief upon the matters therein stated. The clerk of that court refused to enter the same on the general docket, or to issue a subpoena for the defendants. The complainant, Green, then filed his petition in that court, setting out the alleged irregularities in the passage of the aforesaid act proposing the amendment to the

Constitution, as hereinbefore set out, and insisting that said amendment was therefore inproperly inserted in the Constitution, and was void and no part of that instrument. The petition prayed the court to compel the clerk to docket the cause and issue a subpœna for the defendants; and also that he issue an injunction according to a fiat granted by the Hon. E. S. Fisher, one of the judges of this court, granted on the 13th of February, A. D. 1856.

The chancellor refused the prayer of the petition, and dismissed complainant's bill upon the ground that under the amendment to the Constitution he had no jurisdiction over the case. From this decree the complainant appealed.

*Fulton Anderson*, for appellant.

This state of facts presents for the decision of the court two questions:—

1. Whether the Constitution has been changed by competent authority?

2. Whether the courts have the power to examine and decide upon the validity of such pretended amendment?

1. The people, in convention, by an effort of their sovereign power have prescribed the supreme law of the State, and it will be admitted, that any or all the departments of the government, being themselves but the creatures of that supreme law, cannot change or abolish it.

The right to modify or displace the fundamental law, belongs to the people alone, as they alone had the power to establish it.

In the formation of a government, they may not only limit the powers of the different departments amongst which they distribute the governing authority, but they may limit and restrain their own power, and having done so, they can only violate that restraint by an act of revolution.

The people may, if they think proper, delegate the power of changing the organic law to some particular department or body of their own creation, but since, in Mississippi every member of every department of the governing power is sworn to support and obey the Constitution as it is, it follows that none but the people themselves have the power to change it. The concurrent assent, or *will*, of a majority of the people of Mississippi would unques-

tionably change the Constitution, since, by the theory of our go-
vernment, we know no higher authority than that of the majority.
But how is that assent or will to be ascertained? In the absence
of any constitutional provision, it may be admitted that the legis-
lature, with the assent of the governor—being the law-making
power—would have the right to make a law providing for the call-
ing of a convention of the people, either in mass, or by represen-
tation, to express their will. Whether such power exists in the
legislature, under our form of government, which has provided the
mode in which changes may be effected, we need not inquire, since
it is not pretended that the legislature has exercised such power.

Apart from this obvious and direct mode of a convention of the
people, properly assembled, under the authority of the governing
power of the State, to give their assent or express their will on
any proposed change, the people have, in the Constitution itself,
prescribed the mode in which, with more convenience, they may
express their will in reference to the organic law; and in order
that that will may be authentically expressed, they have required
that it shall be done in pursuance of a law previously promulgated
for the purpose. Before they can be called upon to vote upon a
change, or are authorized to vote upon a change, they have pre-
scribed *certain forms to be observed*, and unless those forms are
observed, neither legislatures nor courts can have any authentic
knowledge of their will. "Is it not obvious," says Mr. Webster,
"that men cannot get together and count themselves, and say they
are so many hundreds, and so many thousands, and judge of their
own qualifications, and call themselves the people, and set up a
government?" The question may be asked, with equal perti-
nency, can they, in this mode, in any particular, change the Con-
stitution, as established?

Before the will of the people can be taken or expressed, they
have themselves provided that the proposed change shall be passed
by the legislature in a certain mode. That mode is as follows:—

"Whenever two-thirds of each *branch* of the legislature shall
deem any change, alteration, or amendment, necessary to this
Constitution, such proposed change, alteration, or amendment,
shall be read and passed by a majority of two-thirds of each house
respectively, on each day, for three several days; public notice

VOL. III.—42

thereof shall then be given by the secretary of state, at least six months preceding the next general election, at which the qualified electors shall vote directly for or against such change, alteration, or amendment; and if it shall appear that a majority of the qualified electors voting for members of the legislature shall have voted for the proposed change, alteration, or amendment, then it shall be inserted by the next succeeding legislature as a part of this Constitution, and not otherwise." Revised Constitution, Hutch. Code, 351.

The authority for the people, by vote, to effect such a proposed change, or rather for the returning officers, to take their suffrages and return them to the secretary of state for inspection and examination by the ensuing legislature, in order to ascertain the popular will, exists alone in the above clause of the Constitution. Although the legislature might have the power, by a law regularly passed, to call a convention of the people, to express through their representatives their will, which convention, when assembled, would have supreme power, and could alter or abolish every article of the Constitution, yet it is clear, that when it is proposed to effect a change by suffrage, it can only be done in the mode above pointed out, or in other words, the legislature has no power to take the votes of the people, or authorize them to be taken on such proposed change, unless it shall first pass such proposed change by the two-thirds vote therein required.

If the law was not then passed in the mode required it was a nullity, and all proceedings under it were void, and it would follow that there being no authentic ascertainment of the will of the people, the Constitution would remain unchanged, even though the succeeding legislature might insert the proposed change in that instrument.

Let us then examine whether the amendment in question was passed by the legislature of 1854, in the mode required. If the provision we have quoted stood alone, there would be no question, since twenty-one are not two-thirds of thirty-two, the number which then composed the senate. But it is insisted, on the other hand, that the 15th section of the 3rd article of the Revised Constitution provides, "that a majority of each house shall constitute a quorum to do business;" and that on the occasion when the pre-

tended amendment, on its reading in the senate, only received twenty-one votes, there were present only twenty-two senators, which was more than a quorum, and that, as more than two-thirds of that *quorum* passed it, the requisition of the Constitution was complied with. In other words, it is contended that the Constitution only requires such an amendment to be passed on each reading by two-thirds of the members present, provided there is a quorum, whilst we insist that it requires two-thirds of all the members then composing that branch or house of the legislature, and this is the point to be decided.

We think it may be conclusively shown, both on reason and authority, that the position of those who claim that the amendment was properly passed, is a fallacy. The phrases employed in the Constitution, "two-thirds of *each branch* of the *legislature*," and "two-thirds of each house," of themselves clearly import two-thirds of the whole body, as established by the Constitution, and not two-thirds of a *quorum*, or *part* of such body; nor do we believe that these phrases can be found employed anywhere in the Revised Constitution, or in the first Constitution, or in the Constitution of the United States, to express any other idea than that of the whole house or body referred to. The word "house" is employed in the very clause relied upon—"a majority of each *house* shall constitute a quorum"—to express the idea of *all the members* of the house; and although it is certainly true, that in many parts of the Constitution, where the "house," or "each house" is authorized to do certain acts, a *quorum* may do those acts, that is not because the *quorum is* the house, but because it can, in such cases, exercise the powers of the *house;* but that a *quorum, which is only* a *majority,* may exercise those *powers* which can only be exercised by two-thirds of the house, is manifestly a fallacy, unless it can be shown, not only that the quorum may exercise the powers of the house, but that *it is the house.*

The Constitution is rendered perfectly consistent with itself in every particular, by *construing* the word "house," in every instance in which it is employed, to mean the whole *body,* and not a *part,* and at the same time holding that, in every instance where the *house* may act by a majority, a quorum may also *act,* but not

where a proportion larger than a quorum is required for the house to act.

But the Constitution furnishes us with ample evidence (by look-ing at its other provisions,) of the sense in which the word "house" or "branch" is used. In every instance where legislation of a more than usual solemn and important character, or legislation requiring greater deliberation and unanimity in the houses, or in other words, requiring two-thirds of the whole legislature, is indi-cated in that instrument, we find the same language employed to express the idea; and on the contrary, whenever only two-thirds of a *quorum* are required, we find that idea expressed in intelligi-ble terms.

To illustrate :—The 27th section of the 4th article, provides that judges "may be removed by the governor on the address of two-thirds of both houses of the legislature, the address to be by joint vote of both houses." Hutch. Code, 46. It is clear here, that two-thirds of the body is required, since there is no such thing as a *quorum* of the joint session of the houses.

The 15th section of the 5th article provides that, in case the governor uses his veto, a reconsideration shall be had; and "if, after such reconsideration two-thirds of the house" (in which the bill originated,) shall agree to pass the bill, it shall be sent, with the objections, to the other house, by which it shall likewise be reconsidered; if approved by two-thirds of that house, it shall become a law." Here, again, the Constitution clearly requires two-thirds of the whole of each house; otherwise, we might have the singular anomaly, that a bill might be passed in full session of both houses, thus receiving a majority of the whole legislature, and the same bill being vetoed, might come again before the houses when only a quorum is present, and if passed by *two-thirds* of the *quorum in each,* would become the law, notwithstanding the go-vernor's negative. Thus we should have one-third of the legis-lature (since two-thirds of a bare quorum, or majority in each, is only a fraction over one-third of the whole,) passing a law over the governor's negative, when a majority of the whole could not do it.

Again—the 8th section of the 7th article provides, that no money shall be drawn from the treasury for objects of internal

improvement, "unless a bill for that purpose be approved by two-thirds of both branches of the legislature." The word "branch" in this clause (and that word is used synonymously with "house" in the amendment clause,) evidently means the whole body.

But when the framers of the Constitution provided that two-thirds of a *quorum* might act, and that two-thirds of a whole body should not be required, they knew how to express themselves in the most explicit terms. Thus, in the 2d section of the 6th article, on the subject of impeachments, we read: "All impeachments shall be be tried by the *senate.* When sitting for that purpose the senators shall be on oath or affirmation. *No person shall be convicted without the concurrence of two-thirds of the members present."*

The same intelligent discrimination in the use of language, will be found to have obtained in similar instances, in the first Constitution of Mississippi; and so in the Federal Constitution, the 6th clause of the 3d section of the 1st article, requiring, in case of impeachment, that "no person shall be convicted without the concurrence of two-thirds of the *members* present;" the 2d clause of the 2d section of the 2d article, requiring "two-thirds of the senators present to concur" in making treaties; the 2d clause of the 7th section of article 1st, requiring "two-thirds of each house" to concur in passing a bill against the president's negative, and the 5th article, the amendment provision, requiring, like our own Constitution, two-thirds of both houses to concur in proposing amendments, furnish us with striking proofs, not only that the framers of our own first Constitution, but the wise statesmen who laid the foundations of our national government, when they used the words, "two-thirds of a house, or the houses," intended, and understood the proportional part of the whole body; and when they intended that a proportional part of a mere quorum might act, knew how to say so, in the most intelligible language.

The authorities on the subject in controversy, we think, are conclusive; but in the examination of them, it will be found that the point was considered so free from doubt, that it has by no writer scarcely been considered necessary to declare his opinion expressly on the question, but we are left to gather opinions from their general treatment of the subject. Chancellor Kent, in his examination of the veto power in the Federal Constitution, says: "A *qualified*

negative answers all the salutary purposes of an *absolute* one ; for it is not to be presumed that *two-thirds* of both houses of *congress*, on reconsideration, with the reasoning of the president in opposition to the bill spread at large upon their journals, will ever concur in any unconstitutional measure;" language which he certainly would not have used had he thought, that, in case a bare " quorum" was present on the reconsideration, two-thirds of that quorum, or in other words, a fraction more than one-third of both houses, could overrule the veto. The language of Judge Story, on the same subject, leads us to the conclusion that he entertained the same opinion, especially in the 887th section of his Commentaries on the Constitution. 1 Kent, Com. 240, 241, § 11 ; 2 Story, Com. on the Constitution, §§ 878-889. Such was undoubtedly the opinion of Madison, Jay, and Hamilton, as the following extract from the Federalist, where Mr. Hamilton, there speaking of the veto power, says: "It is to be hoped that it will not often happen that improper views will govern so large a proportion as two-thirds of both *branches* of the legislature at the same time, and this, too, in defiance of the counterpoising weight of the executive." And again, he calls the veto of the president, "his power of returning all bills with objections, which will have the effect of preventing their becoming laws, unless they should afterwards be ratified by two-thirds of each of the *component* members of the legislative body." Federalist, 364, 367, 368, 374.

The history of the Federal convention of 1787, furnishes us with the clearest proof that that body understood the president's veto clause to require two-thirds of the whole of both branches of the legislature to overrule his negative.

That body arrived at a concurrence of sentiment, or rather at a compromise of opinion, on the various subjects embraced in the Constitution, by an elaborate discussion, clause by clause, of the series of resolutions introduced by Mr. Randolph of Virginia. Those resolutions proposed to give the president and judiciary an absolute veto on the acts of the legislature, (2 Madison's State Papers, 733;) and this idea was sustained by Mr. Madison and others of the most distinguished members of the convention. Mr. Pinckney submitted a plan which gave to the executive a negative

on the acts of congress, only to be overruled by *two-thirds of the members present* of each house. 2 Madison's State Papers, 739. On the discussion of Mr. Randolph's resolutions in committee of the whole, Mr. Gerry moved to postpone the 8th resolution, which provided for a council of revision, to consist of the executive and judiciary, with an absolute veto, in order to propose " that the executive shall have the right to negative any legislative act, which shall not be afterwards passed by ———— parts of each *branch* of the national legislature," (2 Madison's State Papers, 783); which motion was agreed to. It will be seen that in the discussion on Mr. Gerry's proposition the main difference of opinion was, as to whether the veto should be absolute or qualified. A motion was in fact made by Wilson and Hamilton, to strike out the words of Gerry's resolution, so as to give the president an absolute veto, and that it was understood by all, that the effect of that proposition was to require a certain proportion of the whole body to overrule the veto. See especially the remarks of Gerry, Wilson, Hamilton, Madison, and Mason. 2 Mad. State Papers, 784-789.

Thus, several propositions were before the body. First. To give the president and judiciary an absolute veto (Mr. Randolph's plan). Second. To give a certain proportion of the *whole* of each *branch* of the legislature, the power to overrule the veto (Mr. Gerry's plan). Third. To give *two-thirds* of the *members present* of each house, the power to overrule the veto (Mr. Pinckney's plan); and Fourth. To give the president an absolute veto (Hamilton and Wilson's plan): and Mr. Gerry's plan was carried, after discussion, by an overwhelming majority. 2 Madison's State Papers, 733, 739, 783-791.

" Two-thirds" of " *each branch*" were then inserted *sub silentio*, in Mr. Gerry's motion, and it was agreed to by eight States to two. Thus showing it to be almost the unanimous opinion of the convention, that two-thirds of the *whole* of each branch of the legislature should concur, to overrule the negative.

These proceedings took place in committee of the whole, on Mr. Randolph's resolution; and on the 13th June, Mr. Gorham, chairman of the committee, reported those resolutions as amended. The 10th of the series, in that report, was Mr. Gerry's motion, as shown above. Subsequently, on the 15th June, Mr. Patterson

proposed a plan of a constitution, which gave no negative to the president, and the convention went into committee of the whole on his plan, and Randolph's resolution. In the committee, Mr. Hamilton again proposed an absolute veto. And again on the 18th July, in committee of the whole, the 10th resolution in the Randolph series, as formerly amended, on motion of Mr. Gerry, requiring two-thirds of *each branch* of the legislature to overrule the veto, came up, when it was passed unanimously. The same vote again took place on the same resolution, on the 21st July, and it was agreed to without dissent. 2 Madison's State Papers, 862, 891, 1130, 1171.

After the convention had acted upon and agreed to the resolutions of Randolph, as amended in committee, on the 26th of July, it referred those resolutions to a committee of detail to report a *constitution* embodying the principles contained in the resolutions, amongst which appeared, as the 13th resolution, Mr. Gerry's motion, which had then been adopted in preference to all others. On the 6th of August, Mr. Rutlege, chairman of the committee of detail, reported a *constitution* embodying the principles agreed to in the resolutions submitted to the committee. That constitution, in art. 6, § 13, contains the provision concerning the presidential veto precisely as we now find it in the Constitution, nor was it ever afterwards changed, though the question frequently came up; thus showing clearly, that in the opinion of the whole convention, the clause as it now stands in the Constitution requiring two-thirds of each house to overrule the veto, carried out their intention that two-thirds of the whole of each branch of the legislature should concur for that purpose, and that, in an instrument which has the same provision in reference to a quorum that our Constitution has. 2 Mad. State Papers, 1220, 1224, 1226, 1231.

Another committee of "style and arrangement," was appointed subsequently, who, in pursuance of the duty imposed on them, on the 12th September, reported the Constitution. It seems that previous to this report, the convention had changed the proportion from two-thirds to three-fourths; though the Constitution, as reported by this committee, does not show it. There seems, in fact, to be some omission in the Madison Papers on this subject; for in acting on this report, which itself contains the proportion

of two-thirds, Mr. Williamson moved to reconsider in order to strike out three-fourths and substitute two-thirds, which was agreed to. In the discussion on this motion it was again apparent that the whole convention considered the proportion required, to be a proportion of the whole of each branch of the legislature. See the remarks of Governeur Morris and others, 3 Madison's State Papers, 1544, 1548, 1562-1565.

On the 13th September, the report from the committee of style and arrangement, was taken up to be compared with the articles of the plan as agreed to by the house, and referred to the committee, and to receive the final corrections and sanction of the convention; and at that time no alteration was even suggested of the word "house," in the veto clause, as not carrying out the sense of the convention, that two-thirds of each *branch* of the legislature, should concur to overrule the executive negative, thus showing that the convention unanimously construed the words "two-thirds of each house," as we insist they should be construed. 3 Madison's State Papers, 1569-1571.

An argument equally conclusive, may be drawn from the *amendment* clause of the Federal Constitution, which is, in fact, less explicit in its directions than our own. " The congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution." Judge Story says, in reference to this provision, that " an amendment, which has the deliberate judgment of *two-thirds of congress,* and of three-fourths of the States, can scarcely be deemed unsuited to the prosperity or security of the republic." He thinks that two-thirds of congress are required, and as there is no such thing as a quorum of *congress,* he must have intended by that phrase two-thirds of the whole body. But Mr. Calhoun is positive and distinct in his opinion. 3 Story, Com. on Const. 685-688; see also the works of Calhoun, vol. 1, p. 183. His experience as a legislator, and his great ability, enable him to speak with more than ordinary authority on the subject; and he does not even hint a doubt of the construction we give to the phrase " two-thirds of both houses," being the correct one.

2. Has the court power to examine and decide upon the validity of the supposed amendment?

The judiciary, like every other branch of the government, is

bound by the Constitution, and sworn to support it. Its duty is to decide the law, and of course to ascertain and know what the law is, and as the Constitution is superior to all other law, and annihilates all other pretended laws inconsistent with it, the primary duty of the judiciary is to know the Constitution, and to hold it to be the supreme law of the land, whatever act or pretended act of whatever department or body, may stand in opposition to it. The court knows, judicially, that the Constitution of 1832, was adopted by the supreme or sovereign power of the people, assembled in convention, and that that instrument remains the primary and fundamental law of the State, until changed by competent authority. As I have already said, it need not be here controverted that the people, the sovereign power of the State, can change it, but since it remains in full force until changed, all its provisions must be enforced by the courts. One of those provisions is the article already quoted, in reference to amendments of the instrument itself. It will be admitted, if the foregoing argument is correct, that, under that provision, the legislature had no power to provide for taking the suffrages of the people on a proposed amendment, except in the mode provided; that mode thus explicitly laid down, was a limitation on the legislative power, and any attempt to exercise the power without complying with the mode prescribed, was a mere nullity. Admit the power of the people to change the Constitution, yet the exercise of that power is revolutionary, unless it is exercised in pursuance of a law guarding the exercise of the right of suffrage. Let me quote again the language of Mr. Webster:—"What do I contend for? I say the will of the people must prevail when it is ascertained; but there must be some legal and authentic mode of ascertaining that will, and then the people may make what government they please." Webster's Works, vol. 6, p. 228. This proposition commends itself, not only from the great weight of Mr. Webster's name as a jurist, but every logical mind must at once recognize its intrinsic truth.

The will of the people must prevail, when it is ascertained in some legal and authentic mode. If the Constitution prescribed no mode, it may be admitted that the legislature, exercising the supreme power of the State by representation, might prescribe the

mode of calling the people together, guarding the right of representation, and by law ascertaining the will of the people; but when the Constitution itself prescribes the mode, it being supreme, must be followed. It does prescribe the mode—it requires that the Constitution shall remain as it is, until two-thirds of each branch of the legislature shall pass a law to change it, and submit that law to the people; but the legislature has no power to pass that law until two-thirds concur; its passage therefore being contrary to the Constitution, it is void. If it is void, then it is not law, and there is no legal and authentic mode to ascertain the will of the people.

But it is said, the legislature of 1856 inserted the proposed change in the Constitution, and its action is conclusive. This is clearly a fallacy. The legislature of 1856 had no more power than any preceding legislature; it had the power to insert the proposed change in the Constitution, on conditions that a law should first be constitutionally passed to ascertain the will of the people, and then, in pursuance of that law, their will had been ascertained. It may have had the power to decide the fact, that a majority of the people voted for the proposed change, but it had no power to say that that vote changed the Constitution, for the plain reason that the vote, even if unanimous, not being taken in pursuance of a law constitutionally passed, could not change the Constitution.

These are propositions which we conceive to be unanswerable, and if so, then the court, in order to know whether the Constitution has been changed, must ascertain whether the law to take the vote of the people, was properly *passed*, or in other words, was a *law*. The courts know the statutes and the Constitution, as well as the common law, and they *judicially* know them. If a law be not passed in the mode prescribed it is no law, and the court, sworn to sustain the Constitution, must so decide. And as the courts *judicially know what the statutes are,* they must judicially know whether they are passed in the mode required, since they are not statutes, if not so passed. I hold it to be clear, that this is a matter of public history, of which the court may refresh its knowledge in such mode as it thinks best; and it was in conformity to this principle that, in New York, it was held that *printed* jour-

nals might be read which had no other characteristics of authentic evidence.   7 Cowen, Rep. 613.

But this whole question has been settled by repeated adjudications.   In Missouri, it has been held that the courts must go behind the printed statutes to ascertain if a law was passed in the mode pointed out by the Constitution.   *M'Bird* v. *The State*, 4 Missouri Rep. 304 ; Dwarris on Stat. (9 Law Lib.) 630.

The Supreme Court of New York, and the Court of Errors of that State, have, in a series of decisions on a case analogous to this, examined the whole question elaborately and ably, and held, without a dissenting voice, that the courts may go behind the printed acts, and may examine the journals to ascertain whether a statute requiring a *two-thirds vote* has received it, and whether it be the law.   *Purdy* v. *The State*, 2 Hill, Rep. 34 ; 4 Ib. 390 ; 1 Denio, Rep. 11 ; 2 Ib. 100 ; *Virginia* v. *Hollingsworth*, 3 Dallas, 378 ; *Vandern's Lessee* v. *Dorance*, 2 Ib. 304.

Upon an examination of the whole subject, it seems to me clear, that if, under our Constitution, the will of the people to change that instrument must be authentically and legally ascertained, and if, to change it in the mode proposed, the legislature can only pass the law constitutionally by a two-thirds vote, and that its action otherwise is illegal, and the courts having the ultimate power to decide what the law and Constitution is, to deny them the power of inquiring whether such law was passed or not by a two-thirds vote, would leave the idea of the permanency and sanctity of constitutions the mere shadow of a shade.

*Geo. S. Yerger*, on same side,
Argued the case orally, and also filed an elaborate brief.

*H. T. Ellett*, for appellees.
Article 3d, section 4th of the Constitution provides, that " the legislative power of the State shall be vested in two distinct *branches:* the one to be styled 'the senate,' and the other 'the house of representatives.' "

In sections 15, 16, 17, 18, 20, 21, 22, 23, and others, these "*branches*" are called "*houses*," showing that these words are used as identical in signification, to designate the same thing.

By section 15, it is provided, that " a majority of each house shall constitute a quorum to do business." This is a general provision, and applies to *all* business that may legitimately be done by either house or branch.

The plain meaning of this provision is, that a majority of the members of each house or branch, when met, shall constitute " *a house*" or " *branch*," for the exercise of its share of " the legislative power of the State."

Several sections immediately following the 15th, define certain powers to be possessed by " each house," and certain duties to be performed; all which evidently relate to " a house" organized, as required in the 15th section, and composed of *a majority of its members.*

Now, it is nowhere provided in the Constitution, by *what vote*, in a house, ordinary legislative business may be passed. It is not said, that the vote of *a majority* of a house shall be sufficient to pass a bill. This principle is derived from the " parliamentary law," in reference to which the Constitution must be supposed to have been framed—and it is as much a part of the Constitution, as if expressly enacted in it.

Then it follows, that the various sections which provide that " each house may or shall" do so and so, mean, when written out in full, " a majority of the members of each house, when met and organized, may, by the vote of the majority of those present," do so and so. The express provision in favor of the right of a majority of a quorum, or house, to do any act is omitted—because, provided for by the " *lex parliamentaria*," but whenever a larger vote than a majority is required, an express provision is inserted.

Thus, in section 16 : " Each house may determine the rules of its own proceedings, punish members for disorderly behavior, and with the consent of two-thirds, expel a member."

No person can doubt but that a majority of the members constitute " a house," a majority of which may determine the rules of its proceedings, and punish members for disorderly behavior; but a majority of such a house cannot expel a member. It requires " the consent of two-thirds." Two-thirds of what ? Why, of the house. " Each house may, with the consent of two-thirds of such house, expel a member." That is its plain reading.

It is clear, then, that a house, a majority of which may determine its rules, and punish members, is a house which, with the consent of two-thirds, may expel a member.

The language of this section is the same, in substance, with that contained in the clause relating to amendments of the Constitution.

And so in section 8 of article 7, prohibiting appropriations of money to objects of internal improvement, unless the bill "be approved by two-thirds of both branches of the legislature." Nobody ever questioned that two-thirds of a quorum were competent to pass such an act.    Such is the construction always acted upon in the legislature—several instances being in the knowledge of the writer.

But in section 9 of article 7, relating to pledges of the faith of the State for loans, &c., the language is widely different.    The words are : " *by a majority of the members of each house.*"    This is equivalent to " a majority of *all* the members of each house ;" and means a majority of all the members *entitled to sit* in each house.    And after providing for a reference of such bill to the legislature, to be chosen at the next regular election, requires the concurrence of a "majority of each branch of the legislature, *so elected,*" which is equivalent to saying, " a majority of *the members so elected to each branch.*"

The phraseology of this section is different from all the rest of the Constitution, and is indicative of a different intention.    This clause requires a majority of all the members of both houses to concur in the bill ; and is the only clause in the Constitution manifesting such intent.    Why the difference in the language used, unless a construction different from the other parts of the instrument was intended ?

The sense of words depends very much upon the manner of their use, and hence authorities as to the meaning of words or phrases, have little application, unless where the words are used in the same manner in all respects.

Again, in section 23, bills are required to be read on three several days, " unless four-fifths of the house, in which the bill shall be pending, may deem it expedient to dispense with this rule."    " A house" in which a bill is pending, is composed of a majority of its members ; and four-fifths of the house, that is, four-fifths of a

majority of the members of the house may dispense with this rule, if only a majority be present. Such is the practical construction always put on this section by the legislature.

It seems plain then, that when the Constitution requires a vote of two-thirds or four-fifths of each house on any question, it means no more than two-thirds or four-fifths of *a house authorized* "*to do business*"—that is, of a quorum.

To apply these views more particularly to the clause respecting the "mode of revising the Constitution." If it be contended that "a house" competent "to do business" generally, is not a house competent to pass a bill proposing an amendment of the Constitution, the exception must be clearly shown—for the power "to do business" is comprehensive enough to embrace *all* business—and there must be restrictive language found in order to take this particular business out of the general power.

Not only is no such restrictive language found, but the same phraseology is here employed that is used in other parts of the instrument, where it was plainly not the intention to require any particular number or proportion of *all the members* of the legislature.

"Whenever two-thirds of each branch of the legislature shall deem," &c. It has been shown that "branch" is used as synonymous with "house," and so it is immediately afterwards in this clause. So in the 16th section : whenever two-thirds of each house shall consent, a member may be expelled; and in section 23: when four-fifths of the house shall deem expedient, the rule may be dispensed with.

The same language used in different parts of the instrument, must receive the same construction, unless there is something to show that it is used in different senses ; and if the context shows that in sections 16 and 23, only a constitutional quorum of a certain size is required, the same construction must be given to the clause under discussion, unless it plainly appears that the words are used in a different sense. If "a quorum" is "a house," and if "a house" and "a branch" mean the same thing, then two-thirds of a quorum, constitutionally organized, is what is required in this clause.

The clause goes on to provide that the amendment shall be

passed " by a majority of two-thirds of each house respectively, on each day, for three several days."

Recurring to the sections already referred to, it is seen that " *each house* may, &c., determine its rules;" " each house may punish its members;" " each house shall keep a journal;" " each house may punish by imprisonment;" " bills may originate in either house," &c., and in all these instances the word *house* is used as descriptive of a *quorum*, and a majority of each house, which is required to do any act, means a majority of a quorum. How then can it be contended that " a majority of two-thirds of each house" means any more than " a majority of two-thirds of a quorum ?"

Suppose the clause read—" Whenever each branch of the legislature shall deem," &c., it " shall be passed by each house respectively," &c., or " by a majority of each house respectively ;" would any body pretend that a vote of a majority of all the members eligible by law, would be required in each branch to pass the law ? If a majority of a quorum could pass the law in such a case, then two-thirds of a quorum can pass it under the Constitution as it stands.

I have confined myself to an examination of the language of the Constitution, having no time to examine the question upon authority.

The grave question, whether the court can go behind the signature of the presiding officers of the two houses, and the approval of the governor, and look into the journals, and hold the law to be void, because, in the loose manner in which these journals are kept, it is not shown affirmatively that the directions of the Constitution have been literally followed, is one which I have not the opportunity to investigate or discuss, nor do I believe it necessary in this case.

It is worthy of remark, however, that this amendment of the Constitution proceeds directly from the people of the State, in their sovereign capacity. It derives no sanction from the legislature, whose office it is merely to *propose*, and not to *enact*. The people having the right to alter their organic law at pleasure, never designed to clog or embarrass the exercise of their right, either by useless forms or by requiring impracticable majorities. Having adopted the amendment by a decided vote—no private right being

involved—and it being a question merely affecting the form of State government—and hence, only a political question—the court ought not to interfere to defeat their deliberately expressed will, without the most clear and imperative necessity.

The law which the court is asked to pronounce a nullity, enacts nothing; it merely proposes in form to the people, an amendment of the organic law, and invites them to consider it, and to vote upon it. The legislature cannot change the Constitution. That is not a portion of the legislative power of the State, but belongs to the popular sovereignty. It is the vote of the people that adopts the amendment, and the action of the legislature merely gives shape to the proposition, and regulates the mode of collecting the sense of the people on the subject. The people are the deliberative, or legislative body, by whom the question is to be decided; and the legislature perform merely the ministerial part of collecting the vote, and ascertaining and promulgating the result. Can the amended Constitution then be held unconstitutional, on the mere ground that the initiatory step was not regularly taken, when the power of the people to adopt, and the fact that they have adopted the amendment, are not at all disputed?

The two houses decided that the bill was constitutionally passed; the presiding officer of each house signed the bill, as required by section 23 of article 3; the governor approved and signed it; it was published in the Pamphlet Acts, under the authority of the legislature, and was thereby made evidence of the law in all courts of the State; it was printed in the newspapers, as required by the Constitution; was voted on and adopted by the people; and was, by the next legislature, incorporated into the Constitution. The very question now agitated, whether the first law required a majority of two-thirds of all the members of both houses, was fully discussed in the senate, both in 1854 and 1856, and with almost, if not entire unanimity decided in the negative. This consideration is entitled to some weight, as a practical construction given to the Constitution by a co-ordinate department, after full deliberation.

But if the court, after all this action by the legislature, the executive, and the people, are inclined to go behind it all, and to entertain the inquiry, whether such a law was in fact passed at all,

and if passed, by what vote, and that too when the question comes up collaterally only, where is such an inquiry to end?

The Constitution does not require the yeas and nays to be entered on the journal in such a case. That is only done at the request of three members, as provided for in section 17 of article 3.

If the court goes behind the signatures of the proper officers, the inquiry must be a *general one,* and applicable to *all cases whatever*—"has such a law in fact been passed, and in strict conformity to the directions of the Constitution?" This inquiry cannot be restricted to cases where irregularities are alleged to be shown affirmatively by the journals. If it is the right and the duty of the court to inquire in one case, whether a law has been constitutionally passed, it must do so in all; and the range of inquiry cannot be limited by the character of the proof. The journal may be wholly silent, or unintelligible, or false, or it may be repugnant and contradictory; as in relation to this Chancery Court bill, the senate journal shows that it received its *second* reading (page 370,) after it had been read *three times.*

The difficulties of such investigations, and the impossibility of fixing any limit to them, is a strong reason why the court should not engage in them at all.

But if the votes of two-thirds of all the members of each house be considered necessary, and if the court will go back and enter upon the investigation, then, in what manner is the inquiry to be pursued? Will not the court require an issue of fact to be made up and tried in the court below? Can the validity of the law be impeached *by evidence* collaterally, and without notice to the opposite party? Will the *appellate* court *receive proof in pais,* to show that a law contained in the statute book, authenticated by all the external forms known to our system of jurisprudence, was not in fact passed by a constitutional majority? It is a question of *fact* merely, and the *proof* is not in the *record.* The journals *may* be competent proof, but does the court take notice, judicially, of all that is contained in the journals of the legislature?

Supposing all these difficulties to be overcome, and the true construction of the Constitution to be as contended for on the opposite side, we find, on looking into the *facts,* that the question turns upon the *finest* of all conceivable points.

It is unnecessary to trace the law through all its various stages. All the members of the senate, who were attentive to this measure, know that the journals wholly fail to make mention of the action of the senate upon this proposition on several occasions, and at several of the steps taken in its progress. But, after a word of explanation, let us examine the journal itself. It will appear, that on *three several days* this bill was read *a third time,* and passed; from which it must have had *five* readings. And this is true. The practice of the senate was this :—The bill was read a first time for information; it was, on a subsequent day, read a second time, and was then open to amendment, commitment, or engrossment. Being amended and perfected, and engrossed for a third reading, it then received three more readings, on three several days, and was required to pass on each day by a vote of two-thirds. This will explain why this bill appears to have received a *third reading, three several times.*

From the senate journal of 1854, p. 310, it appears that this bill passed its third reading by a vote of twenty-one to one.

On the following day it again passed its third reading by a vote of twenty-two to two, (p. 313, of the journal.) This was on the 11th of February.

On the 21st of February the bill was called up, and again passed its third reading by a vote of twenty-three to seven, (p. 378, of journal.)

Now, the senate, when full, consisted of thirty-two members. It is not shown how many were in fact *elected,* nor how many vacancies existed; but the argument is, that it required two-thirds of the whole number to pass the bill proposing to the people an amendment of the Constitution.

Two-thirds of thirty-two are *twenty-one* and *one-third.* On the last vote the bill received *twenty-three* votes; on the preceding vote *twenty-two;* and on the first of the three, *twenty-one* votes. There were more than two-thirds on each of the two last votes, but a deficiency of just *one-third of one vote* on the first call of the yeas and nays. Twenty-two votes is just two-thirds of thirty-three, and is more than two-thirds of thirty-two. Then the question is narrowed down to this—will this deficiency of a *fraction of a man*—of *one-third of a vote*—on one of these three ballots, viti-

ate the law, and defeat the wishes of the people in regard to a cherished amendment of the Constitution?

I respectfully submit, that, inasmuch as twenty-one is *more* than two-thirds of thirty-one, and twenty-two is more than two-thirds of thirty-two, and as members of the legislature cannot be divided into fractions, or votes subdivided into thirds, the court ought to hold that, for the purposes of legislation, and "*ut res magis valeat, quam pereat,*" twenty-one shall be considered two-thirds of thirty-two. It seems to me, that it would be monstrous, to hold that this important movement of reform, so dear to the people of the State, should be defeated, because, on one of three ballots, there was wanting a fraction of one-third of a vote. In the house of representatives the bill, on each reading, actually received *two-thirds* of the whole number of members. House Journal, 548, 594, 617.

The *argumentum ab inconvenienti* is entitled, in this case, to much weight, if the questions at all admit of a doubt. New chancery courts have been opened, judicial districts increased, and terms of courts extended, to meet the requirements of the new system. The transfer of causes to the new courts has been authorized, and in some cases effected, and the old courts closed, for all purposes of new business. Bills have been filed in the new courts, which, if now dismissed for want of jurisdiction, will subject parties to great expense, and in some cases let in the operation of the Statute of Limitations. The laws regulating the practice in the old chancery courts, and establishing the vice-chancery courts, have been repealed, to take effect in little more than a year; and the counties have, some of them, provided dockets and record books adapted to the new system.

All these things are entitled to consideration in the decision of this question, and ought to increase the hesitation which every right-thinking court feels to pronounce an act of the legislature to be void. Indeed, no court ought to, or will declare an act of the legislature unconstitutional, unless the question is clear and free from doubt.

*J. F. Fonte,* on same side.

*William Yerger,* on same side, argued the cause orally.

HANDY, J., delivered the opinion of the court.

This case presents for our determination the important question, whether the bill passed by the legislature of this State, at the January session, 1854, abrogating the 16th section of the 4th article of the Constitution, which established the Superior Court of Chancery, and transferring full and complete equity jurisdiction to the judges of the Circuit Courts, was passed in conformity to the provisions of the Constitution.

It is not denied that this bill was, after its passage, duly and properly published, and submitted to the action of the people at the general election in November, 1855; and that it then received the approval of a majority of the people; and that the action of the legislature of 1856, incorporating it in the Constitution, was in due form. But it is contended, nevertheless, that the act is not a valid part of the Constitution, because the original bill, in one of its readings in the senate, did not receive the votes of two-thirds of all the members composing that body, in its favor—the whole number of senators being thirty-two, and only twenty-one members voting for it on that reading.

It appears, by an inspection of the original enrolled bill in the office of the secretary of state, that it was signed by the president of the senate, and the speaker of the house of representatives, and by the governor, in due form, as a bill duly passed by both houses and approved by the governor.

In the consideration of the case, two questions arise :—

1st. Whether the Constitution requires that a bill proposing an alteration or amendment to the Constitution, to be submitted to the action of the people for their sanction or rejection, shall be passed by a majority of *two-thirds of all the members constituting each house*, or whether it is sufficient that it be passed by a majority of two-thirds of a *quorum* of each house.

2nd. Whether, after the bill has been signed by the speaker and president of the respective houses, as having regularly passed, and after it has received the approval of the governor, and been filed in the office of the secretary of state, it is competent for this court, *ex officio*, to take notice of the journals of proceedings of the two houses, and thereby to inquire and determine whether or not the

bill passed the two houses by the majority required by the Constitution.

These questions have been discussed with great learning and ability by the counsel for the respective parties; and I have given to them that careful and mature consideration which their grave importance demands, and will now proceed to state briefly my conclusions, and the reasons which have led me to them.

The article in the Constitution providing for alterations or amendments of that instrument, and under which the bill involved in this case was passed, is in the following words :—

" Whenever two-thirds of each branch of the legislature shall deem any change, alteration or amendment, necessary to this Constitution, such proposed change, alteration or amendment, shall be read and passed by a majority of two-thirds of each house respectively, on each day, for three several days; public notice thereof shall then be given by the secretary of state, at least six months preceding the next general election, at which the qualified electors shall vote directly for or against such change, alteration or amendment; and if it shall appear that a majority of the qualified electors voting for members of the legislature, shall have voted for the proposed change, alteration or amendment, then it shall be inserted by the next succeeding legislature, as a part of this Constitution, and not otherwise."

The solution of the first question, above stated, depends upon the construction to be given to the words "*branch* of the legislature," and "each *house*," in this article of the Constitution; and we have to ascertain the sense in which these words were intended to be used by the framers of the instrument.

The true sense in which words are used in a statute, is to be ascertained generally by taking them in their ordinary and popular signification, or, if they be terms of art, in their technical signification. But it is also a cardinal rule of exposition, that the intention is to be deduced from the whole and every part of the statute, taken and compared together—from the words and the context— and such a construction adopted as will best effectuate the intention of the law-giver. One part is referred to in order to help the construction of another, and the intent of the legislature is not to be collected from any particular expression, but from a general

view of the whole act. Dwarris on Stat. 658, 698, 702, 703. And when it appears that the framers have used a word in a particular sense generally in the Act, it will be presumed that it was intended to be used in the same sense throughout the Act, unless an intention to give it a different signification plainly appears in the particular part of the Act alleged to be an exception to the general meaning indicated. Ib. 704, et seq. When words are used to which the legislature has given a plain and definite import in the Act, it would be dangerous to put upon them a construction which would amount to holding that the legislature did not mean what it has expressed. Ib. 703.

It follows, from these principles, that the statute itself furnishes the best means of its own exposition, and if the sense in which words were intended to be used can be clearly ascertained from all its parts and provisions, the intention thus indicated shall prevail without resorting to other means of aiding in the construction. And these familiar rules of construction apply with at least as much force to the construction of written constitutions, as to statutes; the former being presumed to be framed with much greater care and consideration than the latter.

Let us, then, inquire whether the various provisions of our Constitution do not show the sense in which the words in question were intended to be used.

By article 3, section 4, " The legislative power of the State is vested in two distinct *branches*, the one to be styled ' the senate,' the other ' the house of representatives,' and both together, ' the legislature of the State of Mississippi.' "

These two " *branches*" of the legislature are afterwards called " *houses*" in sections 15, 16, 17, 18, 20, 21, 23, of the same article; and in article 5, sections 15 and 16 ; and again, in article 7, section 8, they are termed " branches." It is manifest from these provisions, that the terms, " *branch*" and " *house*," are used indiscriminately to mean the same thing,—one division of the legislature.

The 15th section of article 3, provides, that " a majority of *each house* shall constitute a quorum to do business," and that " *each house* shall judge of the qualifications and elections of its own members." " *Each house* may determine the rules of its own

proceedings," section 16 ; shall keep a journal of its proceedings, section 17 ; vacancies in *either house* shall be filled by new elections, section 18 ; *each house* may punish for disorderly behavior in its presence, section 20; the doors of *each house* shall be opened, &c., section 21 ; *neither house* shall, without the consent of the other, adjourn for more than three days, section 22 ; bills may originate in "*either house,*" shall be read *in each house,* and having passed *both houses,* shall be signed, &c., section 23.

From these and other provisions, it is evident that the term *house* means one branch of the legislature as contradistinguished from the other branch, and that a majority of the entire members composing the body constitute, in legal contemplation, the *house* or *branch* of the legislature ; and under the rules of parliamentary law, which, by the silence of the Constitution, must be considered as the rule of action of the body so constituted, a majority of the quorum are competent to do any legislative act which that house could do, unless the particular act be required to be done by a greater number than a majority, by some specific provision of the Constitution. Thus, a quorum is competent to judge of the qualifications and elections of its own members; to elect a speaker or president ; to determine its rules of proceeding, and to do legislative acts generally, except in cases where that power is specially negatived, because these powers are given to the "*house,*" and a majority of the whole members constitute the "*house.*"

Several limitations are made upon this power of a mere majority of the quorum to do particular acts. Thus, " each house may punish members for disorderly behavior, and with the consent of two-thirds, expel a member ;" article 3, section 16. It is plain, that the "house" intended by this provision is the quorum mentioned in the section immediately preceding; but instead of leaving the power of expulsion to the parliamentary rule of a majority of the "house," that is, of the quorum competent to perform general legislative functions, it required the consent of two-thirds of such house to perform the act. So, in article 4, section 27, it is provided that judges may be removed from office by the governor, on the address of "two-thirds of both *houses* of the legislature." And by article 7, section 8, in order to appropriate

money to internal improvements, the bill must be approved by "two-thirds of both *branches* of the legislature."

The propriety of this construction is made more manifest by comparison of the above provisions with others. For instance, it is clear that the provision of article 4, section 27, that judges should be removed upon the address of " two-thirds of both houses of the legislature" intended such "house" as was competent to perform general legislative acts, because, in the subsequent article 6, section 2, it is provided that any civil officer may be convicted on impeachment by the senate, " with the concurrence of *two-thirds of the members present.*" Considering the fact that the consequences of impeachment fixed by the Constitution are much more severe than those of mere removal from office, it is not to be supposed that the Constitution intended that two-thirds of the *members of the senate present* should have power to do the more highly penal act of convicting on an impeachment, but that it should require two-thirds of the entire members composing the body to concur in an address to remove a judge from office.

Again, article 7, section 8, provides that no money shall be appropriated to objects of internal improvements, " unless a bill for that purpose be approved by two-thirds of both branches of the legislature." The section immediately following this provides, that " no law shall ever be passed to raise a loan of money upon the credit of the State, or to pledge the faith of the State for the payment or redemption of any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by *a majority of the members of each house,* and entered on their journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published," &c. Considering the difference between the phraseology used in this section, and that used in the section immediately preceding it, and in all the other parts of the Constitution, it appears that the mode of legislative action authorized in other proceedings, was intended not to apply to acts embraced in the restrictions of this section. In other parts, the language is, the "house," or " branch of the legislature ;" " a majority of the house" or "branch ;" two-thirds of the " house," or of the " branch ;" but in this, it is " a majority of the *members* of each house." This difference is significant, and

it shows, that, in the important matter of binding the State by a contract for the loan of money, which, if regularly done, would be irrepealable, the framers of the Constitution were careful to require a higher sanction than in other acts of legislation, and employed language plainly showing that something more than a vote of the "house" or "branch," which was competent to do general acts of legislation, was required to do this act.

It appears to me, therefore, to be clear, that when the term "house," or "branch" of the legislature is used in the Constitution, without further words defining the sense in which it is used, such an organized legislative body was intended as was competent to do acts of legislation generally, and that such is the general sense in which these words are employed in the Constitution. If the act be such as may be done by the "house" or "branch," such house being constituted by a quorum of its members, the act may be done by a majority of such quorum. If it require two-thirds or four-fifths *of the house* or *branch*, it may be done by two-thirds or four-fifths of the quorum. Consequently, I am of opinion, that the words, "*two-thirds of each branch of the legislature*," and "two-thirds of each house," in the article of the Constitution under consideration, should be taken in the general sense in which the words "house" and "branch" are used in that instrument, and that two-thirds of a duly constituted quorum of each house were competent to do the act provided for in that section.

This conclusion has been sanctioned and sustained by the recent action of the senate of the United States, in reconsidering certain bills passed by congress for internal improvement, and to which the President of the United States had interposed his *veto*. When these bills came up for reconsideration, upon the objections of the President to their becoming laws, the question arose, whether a bill could be passed over the *veto* of the President by two-thirds of the members present of each house, or whether two-thirds of the whole number of members composing the body were requisite. After full debate, in which many of the ablest jurists of the senate participated, it was decided by an almost unanimous vote of that body, that it was only necessary in such case, that the bill should be voted for by two-thirds of the members present, there being a quorum, in order to make it a law. And it was stated by learned

senators, and conceded to be true, that, upon an examination of the precedents in the early history of the Federal Government, in relation to the votes by which bills were passed proposing amendments to the Constitution of the United States, it appeared that, at the first session of the first congress, sundry amendments were passed by both houses, to be submitted for ratification in the mode prescribed by the Constitution, and that, in both houses these proposed amendments were adopted by a vote of two-thirds of the members present, and not by two-thirds of the whole members composing the body.

The authority of the senate of the United States upon the construction of words in the Federal Constitution, identical with those employed in our Constitution, composed as that body is, for the most part, of very learned lawyers, is certainly entitled to great consideration and respect. And especially when we consider that the amendments to the Federal Constitution referred to were passed by the votes of two-thirds of the members present only, many of whom were members of the convention which framed the Constitution, then but recently formed, it tends strongly to show the true construction, intended by the framers of the Constitution, to be given to the words "*two-thirds of the house*," and has an important bearing upon the same words in our Constitution, which were doubtless taken from that precedent. If the question were merely doubtful from the words and context of our Constitution, such an authority and such a precedent might be safely followed.

It has been urged by the counsel for the appellant, that it could not have been intended that an act of so much importance and solemnity, as one for the change of the organic law of the State, should be passed lightly, and by less than a majority of all the members composing each branch of the legislature.

This objection would have more force, if the act of itself operated as an alteration of the Constitution. But it is merely a *proposition* to be submitted to the action of the people. It is a means provided, by which the people may exercise their sovereign right of declaring whether they will change their Constitution or not, thereby establishing the mode in which the government shall be changed, instead of leaving it to unregulated popular impulse. The proposition is presumed to emanate from the people, through their repre-

sentatives, and is regularly submitted for the action of the whole people. There is nothing in the nature of the submission which should cause the free exercise of it to be obstructed, or that could render it dangerous to the stability of the government; because the measure derives all its vital force from the action of the people at the ballot-box, and there can never be danger in submitting, in an established form, to a free people, the proposition, whether they will change their fundamental law. The means provided for the exercise of their sovereign right of changing their Constitution, should receive such a construction as not to trammel the exercise of the right. Difficulties and embarassments in its exercise are in derogation of the right of free government, which is inherent in the people; and the best security against tumult and revolution, is the free and unobstructed privilege to the people of the State, to change their Constitution in the mode prescribed by the instrument.

It may, therefore, be well concluded, that the framers of the Constitution were actuated by these considerations, and thought fit to render the exercise of this high sovereign right as free and untrammelled as possible, believing that, if it was exercised in a regular and established mode, it would never be abused by the people to whom it was reserved.

2. The next question for consideration is, whether it is competent for this court to look behind the enrolled bill on file in the office of the secretary of state, and *ex officio*, to take notice of the journals of the legislature, and thereby to determine whether the bill was passed by the number of votes recognized by the Constitution.

By article 3, section 23, "Every bill, having passed both houses, shall be signed by the speaker and president of their respective houses;" and by article 5, section 15, "Every such bill shall be presented to the governor, and if he approve of it he shall sign it." The Act of March 1st, 1833, which was passed immediately after the adoption of the Constitution, requires that the original rolls of bills and acts of the legislature shall be filed and kept in the office of the secretary of state. Hutch. Code, 386, § 3.

When an act of the legislature has passed through these forms, which are shown upon its face to have been complied with, and is

filed in the secretary's office, it becomes a record, and has all the legal incidents of a record by the rules of the common law, and all the effect, as evidence of the authenticity and validity of the Act, which the parliament rolls of statutes had in England.

Let us see what is the character and legal effect of such acts in England, and observe how nearly the mode of preserving and perpetuating them there resembles the mode which we have adopted.

" After the royal assent is given to a bill, the clerk of the parliament transcribes the act into a *roll*," and "public acts, after enrollment, are delivered into chancery, and this is the original record." 5 Comyn, Dig. Parliament, G. 22.

" Records are the memorials of the proceedings of the legislature and of the king's courts of justice, preserved in rolls of parchment, and *they are considered of such authority that no evidence is allowed to contradict.*" 1 Phill. Ev. 316, 4th Amer. edition. " Acts of the legislature are records written on the rolls of parliament, and are of the highest and most absolute proof." 1 Stark. Ev. 231, 7th Am. edition.

A public statute requires no proof, and when it is necessary to refer to one a copy is not given in evidence, but merely referred to, as it were, to refresh the memory. 1 Stark. Ev. 231, 7th Am. edition.

In this country the courts take judicial notice of our Constitutions, as the fundamental law, and of public acts of the legislature, upon the same principle as in England. Greenl. Ev. § 479.

The record of a public act of the legislature of this State is the enrolled bill, clothed with the solemnities required by the Constitution, and filed in the office of the secretary of state. The signatures of the presiding officers of the two houses, and of the governor, are required in attestation that the bill was passed in due form. This implies the power to determine whether the Act has been passed in conformity to the requisites of the Constitution, and a memorial of it is required to be made, in order that it may stand as a record of the authenticity and validity of the Act. No other record of the Act is required to be kept, and of necessity it must have been intended that the Act so sanctioned and required to be preserved, shall constitute a record, with the incidents appertaining to such a record at common law, importing absolute verity

which no evidence is allowed to contradict, and a compliance with all the forms necessary to its validity. It stands upon the same footing as the record of a court of justice, and every matter adjudicated becomes a part of the record, which thenceforth proves itself, without referring to the evidence on which it has been adjudged. And upon the same principle, that it is incompetent to impeach the jurisdictional, or other facts stated in due form in the record of a judgment, is it incompetent to contradict the record by which the presiding officers of the two branches of the legislature attest that an act has been passed in the form prescribed by the Constitution? · They are both equally *records*, and, therefore, upon established principles of evidence, incapable of contradiction.

The record, consisting of the act signed by the presiding officers of the two houses of the legislature, and by the governor, and filed among the archives of the State, is the entire record by which the genuineness or validity of the act is to be ascertained; and the facts implied by such a record could no more be contradicted, than could it be shown that a judgment of this court, which appeared by the record to be rendered by the whole court, was, in truth, rendered by but one member of the court, or that a formal judgment of an inferior court was rendered without evidence.

But if it was competent to show by extrinsic evidence that an act, verified and attested and enrolled according to the forms of the Constitution, had not been passed as it appeared by the record to have been passed, yet this court cannot take judicial notice of the journals of the legislature in order to ascertain the true state of facts.

In England, the journals of the lords and commons, which are kept as memorials of their proceedings, may be proved by an examined copy; but the courts do not judicially notice them, and they do not import absolute verity, and are not conclusive of the facts stated in them, except in the case of a judgment rendered by the house of lords, as a judicial tribunal, upon appeal. 1 Phill. Ev. 406. In this country the same rule prevails, and such documents are not noticed judicially by the courts, but must be proved. 1 Greenl. Ev. § 481, 482.

In this State, there is no law making the journals of the two houses of the legislature evidence for any purpose, and upon no

principle of common law are they such authoritative public acts as to require the court to take judicial notice of them. The Constitution, it is true, requires that each house shall keep a journal of its proceedings, and publish the same; and the Act of 1833 requires that they shall be deposited and kept in the office of the secretary of state, and that they shall be printed and published. But no provision is made for any sanction to the verity and solemnity of such proceedings, because their legal character did not require any such verification. They are not required to be attested or certified by the presiding officers of the respective houses, nor is any other mode of ensuring their authenticity and accuracy prescribed. It is not required that the names of the members who voted for or against a bill, should be stated on the journal; and, therefore, the journals, if examined judicially, might contain nothing to enable the court to determine whether the bill had passed by the requisite votes; so that this supposed record would entirely fail of its alleged object, and it would be necessary to resort to parol evidence in order to ascertain whether the bill had been passed in conformity to the Constitution. And it is not to be supposed but that such sanctions would have been required, if it had ever been contemplated that such memoranda, which, from the circumstances in which they are made, would be so likely to be loose and uncertain, should have the legal force of solemn records; for we find that such sanctions are carefully required for the enrolled acts of the legislature, which were intended to have the dignity of records.

An exception to this rule is probably to be found in the 15th section of article 5, which provides for the passage, upon reconsideration by the two houses, of bills which shall not receive the approval of the governor, requiring that, upon such reconsideration, such bill may become a law upon its receiving the votes of two-thirds of each house in its favor. But in such case, the provision is imperative, that the names of the members voting for and against the bill shall be entered on the journals of each house respectively. This is not required to be done in other cases; and therefore it may be fairly concluded, that the framers of the Constitution intended to make this an exception to the general rule which they must be presumed to have known, by which the journals could not be judicially noticed. And, as no other provision is

made as to the mode of showing and authenticating the fact, that two-thirds of both houses, have, upon reconsideration, agreed to the passage of the bill, notwithstanding the objections of the governor, as a rule of necessity, by which the best evidence of which the matter is susceptible is admissible to establish the fact, the journals may be noticed as evidence in that particular case.

The object of the requirement in the Constitution that each house should keep and publish a journal of its proceedings, is doubtless the same as that of the Federal Constitution, which is stated by judge Story to be "to ensure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents. The public mind is enlightened by an attentive examination of public measures; patriotism and integrity and wisdom obtain their due reward, and votes are ascertained not by vague conjecture but by positive facts." 2 Story, Comm. on Const. § 838.

In opposition to the view which I take of this subject, the case of *The State* v. *M'Bride*, 4 Missouri, R. 303, is relied upon. It appears to me that the reasoning of that case is loose and unsatisfactory, and is irreconcilable with the fundamental principles of the law of evidence, which are, for the most part, unchanged by the written constitutions of this country. That a court determining upon the constitutionality of an act of the legislature, is bound to support the Constitution, and to decide the question by that test, can furnish no valid reason why the court should take notice of that which is not legal evidence before it, and go into an investigation of matters *in pais*, inspect journals, and settle their authenticity and accuracy, examine witnesses, and hear evidence generally to ascertain whether some form required by the Constitution had not been omitted, or some rule violated in the passage of the Act. Yet such would appear to be the doctrine which the case in Missouri tends to establish.

Several cases from New York, are also relied upon in support of the position that it is competent to inspect the journals in order to ascertain whether the bill was properly passed. The most important of these is that of *The People* v. *Purdy*, 2 Hill, 34, and the same case on appeal in 4 Ib. 394. In that case, the legislative act under consideration was of that character which was required, by the Con-

Green *v.* Weller et al.

stitution of New York, to be passed by two-thirds of the members elected to each house. The statute law of that State, provided that "no bill should be deemed to have passed by the assent of two-thirds of the members elected to each house *unless so certified by the presiding officer of each house.*" The Act in question was published under the certificate of the secretary of state, as a regularly passed act of the legislature; and the question was, whether it was competent for the court to examine the original bill engrossed and filed among the archives of the State, to ascertain whether it contained upon its face the certificates of the presiding officers of both houses, that it had passed by the assent of two-thirds of the members elected to each house. This is really the case presented and considered by the court; and although some of the senators, in delivering their views upon the subject, made some loose remarks about examining the journals, it is clear that the case cannot be held as authority further than the actual facts justified; and so considered, it only holds that it was competent for the court *to examine the record of the enrolled Act,* which was unquestionably the best evidence of the statute, *to ascertain whether it contained upon its face the certificate which was absolutely necessary by law to give it validity.*

In the same way, and upon the same principle, it cannot be doubted but that it would be competent for this court to examine an original enrolled bill, in the office of the secretary of state, to see whether it has the signature of the presiding officer of each house, and of the governor, or whether it was correctly copied in the published volume of the acts of the legislature; because these things are *pre-requisites to the validity of the act, which must appear by the act itself,* and the original bill, as it passed the legislature, and is enrolled in the secretary's office as a record of the act, is the best evidence of its authenticity and true character. But there is a great difference between looking behind the printed statute book to the enrolled Act, and looking behind the enrolled Act to the journals.

It has been urged that it is the duty of the judiciary, in passing upon the constitutionality of acts of the legislature, to preserve with strictness the limitations and safeguards provided in the Constitution against the undue exercise of power by the stronger de-

VOL. III.—44

partment of the government. But the duty of strict confinement within its constitutional power, is equally incumbent on each department of the government. It may be, that legislative acts may be passed without a compliance with the requirements of the Constitution. If such defect or violation appear on the face of the Act, or by that which constitutes the record, which can be judicially noticed, the power of the court to determine the question is indisputable. But if the proper record shows that the Act has received the sanctions required by the Constitution, as evidence of its having been passed agreeably to the Constitution, and its provisions be not repugnant to the Constitution, the regularity and stability of government and the peace of society require that it should have the force of a valid law. For otherwise, every act of the legislature would be open to be impeached, upon an inquiry into the facts which took place at its passage; all confidence in legislative acts would be destroyed; these acts, instead of receiving the sanction of the community, would open the door to litigation, and confusion and anarchy would take the place of law and order. Hence the wise maxim of the law, that such acts are presumed to be duly and solemnly done, until the contrary be shown in proper form; and it is this presumption which protects the judgments of courts from impeachment collaterally.

The courts of justice of the State have no more power to transcend their jurisdiction, than has the legislative department of the government; no more power to determine the rights of a party to a suit over whom they have not jurisdiction, than has the legislature the power to pass an act without a compliance with the forms required by the Constitution. The powers of both departments are subject to the limitations and restrictions imposed by the Constitution. Yet it is perfectly well settled, that if the record of a court shows that the court had jurisdiction over the party, and the subject-matter of the suit be within its jurisdiction, the judgment is conclusive, and incapable of contradiction by proof that the court never, in truth, had jurisdiction over the party. The reason of this is, that, to permit the record to be contradicted, would be to promote litigation, and destroy confidence in the solemn judgments of courts of justice; and that it is better that particular acts of injustice should be borne, than that the administration of

justice through the courts should be defeated, by subjecting their judgments to collateral impeachment. Hence, absolute verity is imparted to the *statements of the record made by the court itself*, *which show the constitutional power of the court to render the judgment*. And the same principle applies with equal force to the attestations of the presiding officers of the legislature. Both of such acts are conclusive until regularly set aside; the one by reversal on appeal, the other by repeal. And every reason founded on the fact, that the powers of the government are limited and defined by a written Constitution, and showing that, therefore, the general rules of evidence, with respect to the regularity and validity of the acts of the legislature, must be considered as abrogated by the nature of the government, must apply with equal force to the rules of evidence in relation to the judgments of courts. If the common law rule of evidence is to be regarded as changed by the Constitution, as to the legislative department, it is not easy to perceive why it is not changed as to the judicial department; for it will scarcely be pretended that the latter is not as much restrained as the former, by the general provisions of the Constitution. Nor can we understand how far the common law rule is abolished, and how far, or by what evidence the acts of the legislature may be annulled. But, indeed, the common law rules of evidence remain equally unaltered as to the acts of both departments, unless expressly abrogated by, or repugnant to the special provisions of the Constitution.

It appears to me, therefore, that when the record of an act of the legislature has the sanctions which the Constitution has provided in order to its validity, the same presumptions of law as to the compliance with incidental forms, and the same reasons of public policy in its favor, which give sanctity to the statements of the record of a judgment of a court, demand that it should be held to have been enacted, as the officers charged with the duty have attested that it was enacted, in conformity to the provisions of the Constitution.

I am therefore of opinion, that the original bill under consideration must be taken as having been duly passed by both branches of the legislature according to the forms of the Constitution, and that the amendment abolishing the Superior Court of Chancery, is

a valid part of the Constitution; and consequently, that the bill in this case which was filed in that court after that amendment was made, was properly dismissed.

SMITH, C. J., delivered the following dissenting opinion.

The questions presented by this case are:—

1st. Whether it is requisite to the validity of a bill, proposing "an alteration, change or an amendment" of the Constitution, that it should be passed by a majority of two-thirds of all the members of each branch of the legislature; or whether it is sufficient if the bill be passed by a vote of two-thirds of a majority, or of a quorum of each house?

2nd. Whether it is competent for this court, after the bill is passed, signed by the speaker and president of the respective houses, and has received the executive sanction, and been filed in the office of the secretary of state, to inquire into the regularity of its passage; and in so doing to notice the legislative journals for the purpose of ascertaining whether the bill has or has not been passed by the required majority?

Under any conditions, and at all times, these are very serious questions. Under the circumstances in which they are now presented, their gravity and importance are greatly enhanced.

The legislature, at its biennial session in 1854, passed an Act for an amendment of the Constitution, by which it was proposed to abolish the Superior Court of Chancery, and to vest full equity jurisdiction in the circuit courts. The Act was published and submitted to the people, at the general election in 1855; and having been voted for by a majority of the electors, was, in due form, inserted by the legislature of 1856, in the Constitution, as a part of that instrument. The Act, thus incorporated, has been recognized and acted under by all the officers and departments of the government, as a part of the fundamental law of the land. Hence, if the Act itself be void, and the consequent action of the people and the legislature under it be held nugatory, considerable injury will be sustained by many citizens, and embarrassment ensue to the State at large.

Under these circumstances the *argumentum ab injuria*, forcibly presses itself upon our consideration. . But in the examination of

questions which not only involve the construction of a provision of the Constitution, but the very existence itself of the fundamental law, considerations of that character, although they render the task a more delicate one, and impose the duty of greater caution and deliberation, ought not to have weight in determining the conclusion. For on the one hand, the damage and embarrassment that would ensue, could, at the worst, be but temporary and limited; while, on the other, a deep and permanent injury might be inflicted upon the commonwealth.

The people, in their aggregate or sovereign capacity, in distinct and express terms, have prescribed the manner in which the Constitution may be altered or amended. They have declared, in effect, therefore, that the Constitution shall not be amended in any other mode; for the express and explicit directions as to the manner in which it shall be altered or amended, necessarily excludes every other method. Hence, the only authentic mode in which the sovereign will of the people can be evoked and ascertained in reference to a projected alteration of the organic law, is by a law enacted in conformity with the directions of the Constitution.

In laying down this proposition, I am, however, not to be understood as meaning that the State, or the people constituting the State, have not at all times and under all circumstances, in the plenitude of their sovereignty, the right to alter or abolish, at will, the existing Constitution and government, and to ordain, in their stead, another Constitution or form of government better calculated to promote their interests; but that, while we affect to act under the Constitution, as it now exists, there is but one way in which the sovereign will of the people can be expressed or ascertained upon a proposed amendment to the Constitution.

If the sovereign will of the people has been evoked and ascertained in the prescribed and authentic mode, there is an end of the question. But until that is done, we are judicially incapable of knowing that any alteration whatever of the Constitution is desired by the people of the State. The alleged facts, therefore, that the proposed amendment received the popular sanction, and that it is a cherished object with the people, ought to have no influence whatever in determining the questions under consideration.

As the supreme judicial tribunal of the State, this court is vested

with the power, and charged with the duty of expounding her laws. Its members are sworn to support the Constitution. One of its most important and solemn duties, therefore, is to refuse, in all cases whatever, to give effect to any law which violates its provisions.

Thus understanding my duties to the public, I shall proceed, as briefly as possible, to state my conclusions, and the reasons for ·them, in relation to the questions under consideration.

The Constitution provides that "whenever two-thirds of each branch of the legislature shall deem any change, alteration or amendment necessary to this Constitution, such proposed change, alteration or amendment shall be read and passed by a majority of two-thirds of each house respectively, on each day, for three several days; public notice thereof shall then be given by the secretary of state, at least six months preceding the next general election, at which the qualified electors shall vote directly for or against such change, alteration or amendment; and if it shall appear that a majority of the qualified electors, voting for members of the legislature, shall have voted for the proposed change, alteration or amendment, then it shall be inserted by the next succeeding legisluture, as a part of this Constitution, and not otherwise."

The legislature, in the passage of the Act proposing the amendment to the Constitution, proceeded under these provisions of that instrument. It is manifest, therefore, that the question first above stated, must be determined exclusively by the meaning attached by the authors of the Constitution to the words "each branch of the legislature," and "each house," employed in the first clause of the article above quoted.

The rules which prevail in the interpretation of statutes, apply generally to the construction of written Constitutions. The object in all cases, is, to ascertain the true meaning or intention of the law; and whenever that intention can be indubitably ascertained, courts are bound to give it effect. Hence, in the exposition of a Constitution, the leading clue to the construction to be made, is the intention of those by whom it was ordained. And to discover that intention, those rules and maxims which have been suggested and sustained by reason and experience, should be employed.

A primary rule of construction is, that the intention of the

authors is to be collected from the words used, taken in their ordinary and familiar acceptation. When the words are not so plain and explicit as not to admit of construction, the intention may be gathered from the subject-matter, and the object of the provision under consideration.

Another rule of construction, peculiarly applicable to instruments by which governments are created, and the fundamental laws of States are laid down, is, that one provision must be construed with reference, or in connexion with the others, so that full, complete, and harmonious action may be given to all of them. We are not to look only at the language of any particular clause, but the intention of the framers is to be deduced from the whole and every part, taken and compared together.

When words or phrases are used in one part, in a plain and manifest sense, they are to receive the same interpretation when used in every other part, unless it manifestly appears from the context, or otherwise, that a different meaning was intended to be applied to them.

And it is laid down, in reference to the construction of statutes, that " where the legislature has used words of a plain and definite import, it would be very dangerous to put upon them a construction, which would amount to holding that the legislature did not mean what it had expressed. The fittest course, in all cases where the intention of the legislature is brought in question is, to adhere to the words of the statute, construing them according to their nature and import, in the order in which they stand in the act." Dwarr. on Stat. (8 L. Lib.) 703.

A judicious application of these rules cannot fail to conduct us to a satisfactory conclusion.

The words above quoted, the construction of which, is the subject of examination, occur in several articles, and numerous sections of the Constitution. The words " branch" and "house," as words having a fixed, definite, and constitutional meaning, are used first in section 4 of article 3, under the head of " Legislative Department." This section declares, that " the legislative power of the State shall be vested in two distinct branches; the one to be styled the senate, the other the house of representatives; and both together, the legislature of the State of Mississippi."

The terms "branch" and "house of representatives," have precisely the same signification attached to them. In the constitutional sense, they are perfectly synonymous. So in regard to the terms "branch" and "senate."

It seems difficult to imagine how any misconception or difference of opinion, as to the true import of these terms, as used in this . section, could have arisen. "Branch," or "house of representatives," "branch," or "senate," designate a component member of the legislative body; and, manifestly, mean not a part of the representatives or senators, but the whole of the constituent members of the respective houses or branches of the legislature. The grant of legislative power is not made to the persons individually, who compose either house or branch, but to the branch or house, as a collective body. The Constitution and the law, made pursuant to it, ascertain and fix the number of members of each house. Indubitably, therefore, the true and only meaning, in this section, of the terms "branch," "house," and "senate," is a component member of the legislative body, constituted of the persons who are duly elected as members of the same.

If any doubt could exist, as to the import of the term "house," as it is used in this article and section, a reference to the 15th section of the same article cannot fail to remove all uncertainty. In that section it is declared, that "a majority of each house shall constitute a quorum to do business, but a smaller number may adjourn from day to day," &c. The word "house," is, indubitably, used here in the same sense in which it is employed in the 4th section. It would be vain to argue, that the word "house," in this connection, does not mean the whole of the members, unless it can be proved that a majority is a smaller number than one-half.

We have thus ascertained the true meaning and import of the terms "branch" and "house," where they are first used in the Constitution. Wherever they are subsequently used, according to one of the rules of construction above laid down, they should receive the same interpretation, unless from the context, the subject-matter, or the object of the convention who framed the Constitution, it is manifest that a different signification was attached to them.

A reference to these terms, as they occur in the different divi-

sions of the Constitution, will show clearly, that they are employed generally, in precisely the same sense in which they were primarily used; and, that whenever the terms "house" or "branch" is used in a different or qualified meaning, the intention is made evident by the subject-matter, or the object of the article in which it is employed.

Thus, in the 18th section of the same article, where it is provided, that "when vacancies happen in either house," the governor is authorized to issue writs of election, &c., it is evident that the word "house" is used to designate a component member of the legislative body, constituted of all the members elect, and not to mean a quorum or majority. For it would be absurd to hold that there could be a "vacancy" in the quorum or majority of either house.

So, in article 4, section 27, under the head of "Judicial Department," the word "houses," has precisely the same signification.

Under the provisions of this section, the "two houses of the legislature," acting as a joint body, constitute an extraordinary tribunal, vested with authority in no wise pertaining to them in their capacity as the law-making department of the government, but purely of a judicial character. The terms "quorum," or "majority," used in reference to the two houses, when alluded to in their legislative capacity, has no application to the subject here treated of. This is manifest from the following considerations. First. The term "quorum," as applied to a joint meeting of the two houses, is not recognized in the Constitution, and is unknown in parliamentary law. Second. In voting an address for the removal of a judicial officer, the concurrence of even a majority of a quorum is not contemplated by the Constitution. "The address (is) to be by joint vote of both houses;" and "two-thirds of both houses of the legislature" must concur, before it can be passed. Hence, as the legislature is now organized, the house of representatives consisting of ninety-nine members, and the senate of thirty-two, it is evident that an address for the removal of a judge may be carried against the vote of every member of the senate. It is, therefore, not to be doubted, that the words "two-thirds of both houses of the legislature," import two-thirds of all the members of each house, and not two-thirds of a quorum of each house.

Again, under the head of "Executive Department," in article 5, section 15, the same meaning is applied to the word "house."

There is nothing in the context, or in the subject-matter of this section, from which it can be collected that a different or qualified meaning was applied to this term. The inference is, therefore, conclusive, that it was used here in the same sense in which it was employed in the two preceding articles of the Constitution. But, in addition, there are other considerations which demonstrate that the word "house" in this article and section, was designed to indicate, not a majority or quorum, but the whole of the members elect of either house of the legislature.

Generally, the executive sanction is essential to all the enactments of the legislature; but in this section it is laid down, that "every bill which shall have passed both houses of the legislature, shall be presented to the governor; if he approve, he shall sign it; but if not, he shall return it with his objections, to the house in which it shall have originated, which shall enter the objections at large upon their journals, and proceed to consider it; if, after such reconsideration, two-thirds of the house shall agree to pass the bill, it shall be sent with the objections to the other house, by which it shall likewise be reconsidered; if approved by two-thirds of that house, it shall become a law," &c.

In the estimation of the Constitution the houses are always full, and all the members elect present whenever the legislature is in session. Hence, in theory, a law, in ordinary cases, is the expressed will of the legislative department, declared by, at least, a majority of each house, to which the executive approval has been given. The power granted to the two houses in this section is an extraordinary power, not embraced in the general range of their legislative authority. It contemplates the enactment of a law, not with the concurrence of the executive department, as required in ordinary cases, but against the veto of the governor. Now, if the term "house" in this section means a quorum, or simple majority of the members of either branch of the legislature, and not the whole of the members of the respective houses, a bill, which could only become a law, according to the theory of the Constitution, by the vote of a majority of each house, with the executive sanction, might be made a law against the assent of the governor, by the

concurrence of less than a majority of either branch of the legislature. To illustrate:—Let it be supposed that the house of representatives consists of one hundred members; fifty-one, if the house be full, must vote for a bill, before it can be passed. If a bill thus passed be vetoed by the governor, and returned with his objections, upon the supposition that the word "house" in this section means a simple majority, or quorum, it might be made a law against his assent, by the vote of thirty-four members; which would be less, by seventeen, than was required in the first instance to pass the bill. Surely, a construction which would lead to so monstrous a constitutional absurdity, and which is calculated to defeat the very object sought to be attained by the convention, is not to be tolerated.

And again, in article 7, sections 8, 9, under the head of " General Provisions," the words "branch" and "house" evidently import the whole body, as organized by the Constitution and the law; and not a quorum, or majority of the members.

Thus, in every division or department of the Constitution the same meaning is attached to the terms "branch" and "house." And it may be safely affirmed, that in every instance where legislation of more than ordinary importance is contemplated, and that in all cases where it was deemed necessary to guard the interests of the public, by requiring a concurrence of more than a simple majority of the two houses, these terms import the whole, and not a part of the house. In all these instances the convention has employed the proper and appropriate language to express their intention. The words or phrases usually employed for this purpose are, "two-thirds of both houses of the legislature;" article 4; section 27. "Two-thirds of each house;" article 5, section 15; and "two-thirds of both branches of the legislature;" article 7, section 8. These words, of themselves, unexplained by other or superadded words, clearly import the whole body, and exclude the idea that a quorum, or only part of the body referred to was meant. In the very clause (article 3, section 15,) in which it is declared that a majority of each house shall constitute a quorum to do business, the meaning of the term "house" is indubitably ascertained to be a component member of the legislative body, consisting of all the members elect.

A majority of each house is authorized to transact the ordinary business of legislation. And doubtless, in some of the sections in the third article, where the term "house" is employed, a "quorum," or simple majority of the members is meant; as in section 16, "each house may determine the rules of its own proceedings, punish members for disorderly behaviour," &c.; so, in section 20, "each house may punish, by imprisonment, during the session, any person not a member, for disrespectful or disorderly behaviour in its presence, or for obstructing any of its proceedings," &c.; and also in sections 22, 23, 24. In these sections the word "house" is used as synonymous with "quorum," or "majority" of the house. The same word is used also to designate the halls in which the legislature holds its sessions; section 21, article 3. But in these, as in every instance in which the term "house" is used in a qualified sense, or as importing only a quorum or majority, its action is limited to subjects of ordinary legislation, to matters connected with its own organization, the preservation of good order and the well conducting of business. Thus, it is only by the inversion of a plain rule of construction,—by explaining terms, the import of which is clearly ascertained in every department of the Constitution, by the particular signification attached to them when used in different connections, and in reference to entirely different subjects, that any doubt, misconception, or controversy could have arisen.

The construction which, in my opinion, ought to be put upon these terms, vindicates the consistency, the policy, and the wisdom of the Constitution. By adopting this construction, we secure, in reference to all legislation of more than ordinary importance and solemnity, maturer deliberation, and a concurrence of a greater proportion of the two houses; thus preventing, to some extent at least, hasty, ill-advised and sinister legislation. By holding that the words "branch" and "house," in every instance in which they are used—unless from the context or otherwise, it plainly appears that they were employed in a qualified sense—import the whole and not a part of the body to which they refer; and, as it is the house which always acts, whether the act is performed by a "quorum," "two-thirds," or a greater proportion, by holding also that whenever "the house" may act by a simple majority, a quorum

may also act, but that a quorum is incompetent to act, where a greater proportion is required for the house itself to act, the language used in the Constitution is rendered consistent with itself in every particular, and all its provisions brought into harmonious operation.

Having ascertained the true constitutional import of the terms "branch" and "house," it follows, of necessity, that they are to receive the same construction, in the article for amending the Constitution, unless, it is manifest from the context the subject-matter, or the object, that a different interpretation was applied to them.

It is not pretended that the language of the article, taken without reference to any other part or provision of the Constitution, furnishes evidence of such intention. On the contrary, it is not to be questioned that these terms, as they stand associated with the language of the article, bear the precise signification applied to them in the fourth section, third article of the Constitution, where their import is fixed. Hence, unless these terms are explained by some other provision of the Constitution, or unless a different meaning, arising from the subject of the article in which they occur, is to be affixed, by " two-thirds of each house" is meant, not two-thirds of a quorum of each house, but two-thirds of the members of each house.

But in the argument it was assumed, that the terms "branch" or "house" implied, according to their general meaning, an organized body, which, under the Constitution, was authorized to perform acts of general legislation. Hence, it is contended, that wherever these terms are used in the Constitution, without further words defining the sense in which they are used, a quorum or simple majority of the house is indicated.

I have shown that this assumption is unfounded. It remains, then, to be ascertained whether, from the nature and character of the subject and object of the article, it can be collected that a different meaning was intended.

That this inquiry must be responded to in the negative, seems scarcely to admit of doubt.

According to the American theory of government, the legislative power does not embrace the authority to ordain constitutions, or to alter or abolish the form of government. It is hence, not to

be controverted that, under the general grant of legislative authority to the two houses, the power to change, alter or amend the fundamental law of the State, was not conferred.

The power, therefore, which by this article in the Constitution, was delegated to the senate and house of representatives, is not, in its nature, legislative. It is an extraordinary power pertaining in no respect, whatever, to their legislative functions. The effect of the provision is to erect the legislative branches into a tribunal, whose peculiar and exclusive duty it is to determine, in the name of the sovereign power of the State, when it is necessary to amend the fundamental laws, and what alterations should be made in them. It is true, in regard to any proposition to amend the Constitution, submitted by this tribunal, an absolute veto is reserved to the people. But for this reason its functions are not the less solemn and important. It has the exclusive right to decide when it is expedient to propose a change, and to determine the precise form and character of the projected amendment; the people have no right to modify the proposition submitted to them; they have reserved the power simply to approve or reject.

Surely, if any thing should be stable and permanent—not to be changed for slight and transient causes; if any thing ought to be held sacred—not to be touched, except by the cautious hand of wisdom, it is the organic law which a people have ordained.

I may safely assume that, if there be any one matter of greater importance, and of a more solemn character than another; or if there be a measure which should require greater deliberation, and a concurrence of a greater proportion of the two houses to pass it, it is a proposition to change the Constitution.

In my opinion, therefore, all the considerations arising out of the subject-matter of this provision, and the objects of the convention, fortify the conclusion that it is essential to the validity of an act, the object of which is to change, alter or amend the Constitution, that it should be passed by a majority of two-thirds of the whole of each house " on three several occasions."

2. It is admitted, according to this construction, that the bill in question was not passed in conformity with the provisions of the Constitution. It becomes, therefore, necessary to examine the second question, as above stated.

In this State, all bills having passed both houses, are enrolled and signed by the speaker and president of the senate. Art. 3, sect. 23. And every bill having thus passed both houses, and having been signed by the respective presiding officers of those bodies, must be presented to the governor, who, if he approve, is required to sign it. Art. 5, sect. 15.

No bill, except in the cases especially provided for, can have the force and effect of a law until this is done. The general method of authenticating the acts of the legislature is, therefore, by the signature of the presiding officers, and the governor.

By the Act of March 1st, 1833, it is made the duty of the secretary of state to take charge of, and safely keep in his office, the journals, papers, documents, and proceedings of both houses of the legislature. It is also made the duty of the secretary of the senate, and the clerk of the house of representatives, immediately upon the adjournment of the legislature, to deliver to the secretary of state, " every document and paper in anywise appertaining to the same." Hutch. Code, 386, § 2.

Unless the terms, "documents and papers" pertaining to the proceedings of the legislature, include the acts and resolutions, no authority is given by law to any one to deliver these documents to the secretary of state. The law, however, presumes that they go legally into his possession, as he is required, immediately after they shall have been delivered to him, to cause to be made out and delivered to the printer, an attested copy of the acts and resolutions passed at each session; and to compare the printed copies with the original rolls, "which original rolls shall be filed and kept in his office." Hutch. Dig. 386, § 3.

It was said, in argument, that when an act of the legislature has passed through these forms, and has been filed in the secretary's office, it becomes a record, and has all the legal incidents of a record, by the rules of the common law; and the same effect as evidence of the validity and existence of the Act, as the parliament rolls have in England.

It is, hence, contended, that the Act, which it is admitted was signed by the presiding officers of the two houses, and by the governor, and filed in the secretary's office, is conclusive, not only

of the existence of the statute, but also that it was passed in strict conformity with the directions in the Constitution.

The public acts of parliament, after they have received the royal assent, are transcribed upon parchment rolls, certified by the clerk of parliament, and deposited in the rolls office. The original acts are retained in the custody of parliament. The rolls, when thus certified and deposited in chancery, are records, and import evidence of the highest and most absolute character. 2 Phil. Ev. (ed. by H. & C.) 128; 1 Stark. Ev. 231, (7th Am. ed.)

In England, the courts take judicial notice of the public acts of the realm. And, as the plea of *nul tiel record* cannot be pleaded to a general statute, whether it be a statute or not must be ascertained by the judges, from an inspection of the record, or in any other appropriate method. Dwarr. on Stat. 631.

In Great Britain, there is no written fundamental law, defining and limiting the powers of the government, by which the validity of the acts of any of the departments may be tested. The parliament, in a political and legislative sense, is omnipotent and supreme. The power and jurisdiction of parliament, says Lord Coke, are so transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds. 4 Inst. 36. "And so long," adds Sir William Blackstone, " as the British Constitution lasts, it may be safely affirmed, that the power of parliament is absolute and uncontrolled." 2 Com. 162.

A void act of legislation necessarily implies the existence of a superior and controlling power in the State. There are but two conceivable reasons for which an act can be void. First. For want of power in the legislature to pass it. Second. Because it has not been passed in the method required to make it valid. And the universally received doctrine in England is, that an act of parliament of which the terms are explicit, and the meaning plain, cannot be questioned, or its authority controlled in any court whatever. The idea, therefore, of an unconstitutional law of parliament, can have no existence under the English system of government. The parliament rolls, which are transcripts of the acts, made up under the supervision of officers appointed by parliament, and declared by law to be records, necessarily, I may say naturally, are conclusive evidence of the existence of the statute, and imply the due per-

formance of the necessary pre-requisites in their enactment. It is a rule which flows from the absolute and unlimited jurisdiction and power of parliament.

The principles of the common law, unsuited to our condition, or repugnant to the spirit of our government, have no existence within this commonwealth. It required no act of positive legislation to repeal them. They have been excluded by the silent operation of our institutions. It is clear, therefore, that this rule, as a principle of the common law, can have no operation within this State.

For, under the American theory of government, the *jus summi imperii*, the supreme, absolute, uncontrolled authority, does not reside in any of the departments of the government, nor in all of them united. It is inherent in the people, from whom all power is derived, and upon whose consent all government is founded. The Constitution derives its existence from the immediate act and consent of the people. It is a law to the government "which derives its just powers therefrom, as from the assent of the governed, for whose benefit that power is intrusted." As the Constitution is the supreme law, all the acts of the government or the departments thereof, done in contravention of its provisions, are inoperative and void. An act of the legislature which has not been passed in conformity with the directions of the Constitution, is equally void, with one whose terms violate its provisions. Bill of Rights, article 3.

The judiciary, like all the departments, are bound by the Constitution, and sworn to support it. It is, therefore, their duty to pronounce an act of the legislature null, and to refuse to give it effect, if it be void for either of these causes.

It will not be controverted, that an act making an appropriation for works of internal improvement, which was not passed by two-thirds of each branch of the legislature, is as perfect a nullity,—is as void,—as a statute, although agreed to by every member, which impairs the obligation of a contract. Nor can it be a subject of debate, that if, in the case supposed, it could be judicially ascertained, that the Act was not passed by a two-thirds vote of each house, the courts would have the power, and, hence, be bound to declare it void.

But if, upon the principle of the common law, on which it is

VOL. III.—45

maintained that the enrolled act, signed by the presiding officers of the two houses, and approved by the governor, is conclusive as to every question, it is clear, that the Constitution, in a vital particular, might be evaded or defeated by a corrupt or ignorant legislature; and the judiciary, thus far, be rendered incapable of performing their duty, in guarding the rights of the people, by preserving their Constitution inviolate.

The proposition, that when an act, purporting upon its face to have been regularly passed, is signed by the presiding officers of their respective houses, it is to be taken and held conclusive evidence that it was duly enacted, whether, in fact, it was so passed or not, is, therefore, clearly inconsistent with the existence of a higher authority—a supreme law—to whose behests the legislative power is bound to conform. The assertion of the principle contained in this proposition would practically abrogate the explicit and imperative directions of the Constitution, in regard to the forms and modes of passing laws having reference to the various subjects of legislation. It would leave as the sole safeguard for the protection of the Constitution, and the only security for the rights of the people, the honesty and fidelity of the legislative bodies.

It was said, in argument, that in all political organizations, some individual or some tribunal must ultimately be trusted; that there is a point, beyond which it is impracticable to apply any effective check against the abuse of delegated authority; and, that in the arrangement of the political machinery, society, in many instances, is, of necessity, compelled to confide in the virtue, intelligence, and patriotism of those intrusted with power, as the sole guaranty for its faithful exercise. And, that as the authority to determine when a bill has been passed by the legislature in the mode prescribed in the Constitution, must be lodged somewhere, it has been properly and necessarily deposited with the presiding officers of the two houses, and the governor; and when they determine that question by affixing their signatures to the Act, their decision is final and conclusive.

That these positions are untenable, and, hence, are no sufficient answer to the views above expressed, a brief examination will show.

Two things are essential to the validity of every act of legislation. First. The legislature must possess the power to enact the statute in question. Second. The Act must have been passed in the mode prescribed in the Constitution. When the validity of a statute is brought in question, its constitutionality must be determined from its face, by a comparison of its terms with the provisions of the Constitution; or by matter *dehors*, when the question is in reference to the mode of enactment.

When the question before either house of the legislature is, whether a bill—as for example, a bill proposing an amendment of the Constitution—should be passed by two-thirds of a quorum; or, whether it is essential that two-thirds of the whole house should concur in its passage, it is manifest that the point to be determined is not a question of mere fact; that is, whether two-thirds of a majority, or two-thirds of the whole house have concurred in passing the bill. It is clearly a question of constitutional power, which the house must decide, but which it can only determine by construing the Constitution.

Would the judgment or decision of the house, in the supposed case, be final and conclusive, and hence, necessarily exclusive of the power of the judiciary? It seems to me, if there is a settled principle of constitutional law, it would not.

In all cases, whatever, where the legislature proceeds to act upon a given subject, it must, beforehand, judge of its authority to legislate. It must, of necessity, before it can legislate on any subject, decide that it possesses the power to do so. And there is not the slightest distinction in principle, between a case where the house decides that it has the power, by a majority, or two-thirds of a quorum, to enact a law, and a case in which it determines that it is vested with authority to legislate on a given subject. Both questions must be determined by a construction of the Constitution; but, as the legislature derives its power from the Constitution, and can only act in subserviency to its mandates, it would be absurd to hold, that its determination upon either question is final and conclusive. The legislature is not the exclusive judge of its own jurisdiction and power; and it is not to be contested that, whatever view it may take of them, will not preclude the judiciary from declaring its acts void.

If the legislature cannot determine definitively and conclusively, that an act passed for amending the Constitution was enacted in conformity with its requirements, it is scarcely necessary to add, that the certificate of the presiding officers of the two houses is not more conclusive as to any matter connected with the question, whether such an act is a valid constitutional act of legislation. The signing or certifying a bill by the speaker and president, after it has been passed by their respective houses, is purely ministerial. It partakes nothing of the character of a judicial sentence; it is the method adopted of notifying the governor officially, that the bill has been passed by the legislature. It is undoubtedly *prima facie* evidence of the fact that the bill was passed; but on no principle of law or common sense, can it be held as amounting to more than presumptive evidence as to any matter connected with the question of its constitutionality.

When the validity, and of consequence, the existence of a statute is brought in question, upon the ground that the Constitution was violated in the mode of its enactment, the question is, in what way shall it be ascertained? By what evidence shall the question be determined?

The Constitution has not, by implication, nor in express language, declared that the enrolled act deposited in the secretary's office, shall constitute the record of the statute, to which the same incidents attach which belong to the parliament rolls in England. And if I am correct in the views above expressed, of the theory and structure of our government, it results, logically and necessarily, that the enrolled act is not the highest nor the most conclusive evidence to which resort may be had.

There is no statute which declares expressly, that either the enrolled act, deposited with the secretary of state, nor the printed copy of the acts, shall be the evidence to prove the existence of the statutes. There can exist no doubt, however, that the enrolled act would be better evidence than the printed copy, and that either is *prima facie* evidence of the existence of the act. The question then is, what is the highest and best evidence on the subject?

The Constitution requires each house to keep a journal of its proceedings, and to publish the same: article 3, section 17. These journals are made up under the immediate supervision of the re-

spective branches of the legislature, and are required by law to be deposited in the office of the secretary of state. They are the deliberate and solemn acts of the two bodies; they contain an authentic history of their legislative proceedings; they fulfil all the conditions of a record, and are universally recognized as such. Greenl. Ev. § 482.

The Constitution has laid down specific directions as to the method in which certain laws must be enacted. If not passed agreeably to these directions, it is needless to say that they are null and void. But why declare an act to be null and void, unless it be passed in the prescribed mode, if the mere fact that it was adopted by the legislature, is conclusive that it was so passed? The proposition presents a palpable absurdity. It is absurd to say, that an act not done in a prescribed mode shall be void, and at the same time to hold that, in no matter what way it shall have been performed it is valid. Upon this construction, the restriction upon the will and power of the legislature is totally unmeaning and ineffectual; it nullifies the Constitution. It is of the very nature and essence of the fundamental law of a State, that it renders void every act done in violation of its provisions. The idea cannot exist, that a statute which is repugnant to it, can have the force and effect of a law. It belongs to the judicial department, as a matter of right and of duty, to declare every act of the legislature made in violation of the Constitution, or any provision of it, null and void. It may, therefore, be assumed, that the framers of that instrument designed to provide the means by which all acts of the legislature violative of its provisions, might be inquired into and avoided.

If such was their intention, what more appropriate method, I ask, could they have devised, than the one which, in my opinion, they have adopted. It is made the solemn duty of the two houses to keep a journal of their proceedings. This was certainly the most appropriate, as well as the most natural method. of securing a correct history and record of their legislative proceedings. If the journals are honestly kept; if the manifest intention of the Constitution is complied with, they must contain distinct and positive evidence whether, in the enactment of any statute, the mandates of the Constitution have been obeyed? If so kept, they

furnish, in every instance, conclusive evidence, and in some instances, the only proof whether an alleged act has been passed or not.

In the absence of any constitutional provision or statutory enactment declaring in what method the statutes may be proved, it may therefore be safely affirmed that the legislative journals constitute the highest and most conclusive evidence of the existence and due enactment of an alleged statute.

Additional considerations exist, which would seem to render this position positively certain.

When a bill, having passed both houses, is vetoed by the governor and returned to the house in which it shall have originated, it is reconsidered; if agreed to by two-thirds, it is sent to the other house, which is likewise required to reconsider it; and if two-thirds of that house concur in its passage it becomes a law, without or rather against the assent of the governor. Art. 5, sect. 15. It is provided also, in the same section, that "if any bill shall not be returned by the governor within six days (Sundays excepted) after it shall have been presented to him, the same shall become a law, in like manner as if he had signed it, unless the legislature, by their adjournment, prevent its return, in which case it shall not become a law.".

Generally, the signature of the governor is essential. But in these instances the enrolled act, which has become a law, if filed in the secretary's office, will be unattested by the signature of the executive. Under these circumstances what would it prove? what is the nature of the evidence which it imports?

If the legal effect and incidents of a record at the common law attach to the legislative rolls, as they are called, an act signed by the speaker and president of their respective houses, but which is unattested by the governor's signature, would not be any evidence whatever of the existence of the law, for the obvious reason that the record would show, upon its face, that the act was not approved by the executive department. If the legislative roll was the conclusive, and hence exclusive proof of the existence of a statute, it would, in this case, be evidence not of the existence, but conclusive proof of the non-existence of the law.

Courts are bound to take notice of public statutes without their

being formally set forth. It is their province, therefore, to determine whether they be laws or not. Now, where an act has become the law without the assent of the governor, or against his consent, as in these cases provided for in the Constitution, how are the courts to ascertain whether it be a law or not?

Let us take the case of a bill which, having passed both houses, is vetoed by the governor, and returned with his objections. If it be re-enacted by a concurrence of two-thirds of each house, it becomes a law. The act, at the close of the session, is delivered by the clerk of the house or the secretary of the senate, to the secretary of state, and is placed on file with "all the papers and documents pertaining to the proceedings of the legislature." As neither the law nor the Constitution has authorized or required the presiding officers of the two houses to certify to the governor or to any other officer, the fact of the re-enactment of the bill over the executive veto, it could exhibit, when on file in the secretary's office no evidence of its having become a law, except what is furnished by the attestation of the presiding officers of the two houses. But as their signatures were affixed to the bill upon its passage, in the first instance, before it was presented to the governor for approval, and of consequence, before it was a law, they would be no attestation of any subsequent act of either the executive or legislative department, which would be essential to its validity as a statute.

Again, where a bill, having passed both houses, has, in consequence of its retention for six days, become a law without the approval of the governor, the legislative rolls would furnish no better evidence of the bill having become a law, than in the instance where a bill has been re-enacted against the veto of the governor. Indeed there might be no legislative or statute roll on file in the secretary's office; as neither the Constitution nor the law has made, in such a case, any provision for certifying and filing the bill in the office of the secretary.

In each of these instances, it is not to be questioned that the act is a law. But in either case the rolls furnish no evidence of that fact; on the contrary, if they alone are to be consulted, the proof would be conclusive against the existence of the law. In either case the courts are bound to take notice of the act; they are bound

to know that it is a law, because it has been made or become such in the mode prescribed by the Constitution. The journals, in all cases, show positively and distinctly whether the bill was passed; whether, having passed, it was presented and approved by the governor, or was returned with his objections to the house in which it originated; and in these instances, they contain the only evidence of the existence of the law. It results, therefore, necessarily, that the courts are bound, *ex officio*, to take notice of the journals as the public records of the land, containing the highest and most authentic evidence of the existence of the law. And, if the journals are the highest and best evidence as to the question whether an alleged statute was in fact passed by the legislature, they must constitute equal evidence as to the method in which it was in fact adopted.

This question is not a new one in this country. In Missouri, in the case of *The State* v. *M'Bride*, 4 Missouri, R. 303, it was held that the legislative journals were competent evidence to show, whether in the passage of an act to amend the Constitution, the provisions of the Constitution had been complied with, and the bill passed by the requisite majority.

In the State of Illinois, the same doctrine has been recognized. In the case of *The People* v. *Campbell*, 3 Gilman, R. 466. It was decided that a joint resolution repealing a statute, was null and void, because it was not read on three several occasions as required by the Constitution. It is true, in that case, that the question whether it was competent to look beyond the legislative roll for the purpose of ascertaining from the journal, if the resolution was adopted in the mode prescribed in the Constitution, was not raised. The right was conceded, and the journals were referred to for that purpose.

In the case of *The People* v. *Purdy*, 2 Hill, (N. Y.) Rep. 31, the question was, whether the court could, legitimately, look beyond the printed statute book, for the purpose of ascertaining whether bills coming within the two-thirds clause of the Constitution had received, on their passage, the requisite number of votes.

The printed copy of the statutes, published by the State printer, was made evidence by the statute law of New York. 1 R. S. 164, § 191. It was also declared, that "no bill should be deemed

to have been passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officers of each house." R. S. 162, § 3.

The question arose upon a statute coming within the two-thirds clause, but which was certified as an ordinary majority bill. And Mr. Justice Bronson held, notwithstanding the explicit declaration of the statute, that "all laws passed by the legislature might be read from the volumes printed under the direction of the secretary of state ;" that it was competent to look beyond the printed copy contained in the statute book, for the purpose of ascertaining whether the act was passed in conformity with the directions of the Constitution.

Although it was also held, that the engrossed bill on file in the secretary's office, certified as an ordinary majority bill, was *prima facie* evidence that it was not passed by the assent of two-thirds of each house ; as a matter of fact, the journals were inspected by the court, and they proved the fact, that the bill had not been passed by the constitutional vote. It is manifest, therefore, that the question before the court in that case, is precisely analogous to the question now before us. And I quote the language of the learned judge, as a strong vindication of the doctrine contended for in this case.

He said : "We live under a government of laws, reaching as well to the legislature as to the other departments of government ; and if we wish to uphold and perpetuate free institutions, we must maintain a vigilant watch against all encroachments of power, whether arising from mistake or design, and from whatever source they may proceed. The Constitution, in its terms, and upon a particular class of cases upon which the legislature may act, denies to a bare majority of members, the power, which, in other cases, they undeniably possess. To give efficiency to this provision, and secure the people against the exercise of powers not granted, we must, I think, look beyond the printed statute book, and inquire whether bills creating or altering corporations have received the requisite number of votes."

The views and opinion of Judge Bronson, upon this question, were sanctioned and sustained, unanimously, by the Court of Errors ; and to judge from the opinions of the different members

of the court, the question, whether the legislative journals could, legitimately, be consulted, for the purpose of ascertaining whether the act was passed by the vote required in the Constitution, was scarcely considered a debateable one.  *Purdy* v. *The People*, 4 Hill, Rep.  I cite that case, therefore, as an authority in favor of the opinion above expressed.

I have found no American authority holding a different doctrine; and believe that none can be found.  As the question stands now before the courts of this country, the authority is all in favor of the view which I have taken of it; and I have endeavored to show that that view is sustained by reason.

I have thus, in as brief a manner as possible, stated my conclusions, and the reasons on which they are founded.  It remains only, to declare my opinion, which is, that the Act of the 2d March, 1854, proposing an amendment of the Constitution, was null and void, having been passed in violation of its express provisions; consequently, that the subsequent action of the people and the legislature, under it, is equally null and void; and, hence, that the amendment inserted in the Constitution at the late session of the legislature, is no part of the Constitution of the State of Mississippi.

NOTE.—For Judge Fisher's opinion, see appendix to vol. 4.