## ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* STATE.

### Opinion delivered January 29, 1912.

1. STATUTES—PROVINCE OF COURTS TO CONSTRUE.—It is the province of the court to construe the law and to instruct the jury definitely as to the interpretation of statutes.  (Page 207.)

2. SAME—CONSTRUCTION.—In determining the meaning of words in a statute, the courts will consider what is the usual and ordinary interpretation given to them by those using them, and also consider them in reference to the subject-matter in the mind of the Legislature. (Page 208.)

3. SAME—CONSTRUCTION OF STATUTE—SOURCES OF INFORMATION.—In determining the meaning of a statute, the courts are not confined to the testimony of witnesses, but may call to their assistance persons who have information relative thereto, or may apply to any other available source to obtain such information.   (Page 208.)

4. MASTER AND SERVANT—RAILROADS—DIVISION POINTS.—Under Acts of 1905, p. 593, making it unlawful for railroad companies or persons who own, control or operate any lines of railroad "to build, construct or repair railroad equipment without first erecting and maintaining at every division point a building or shed over the repair tracks, same to be provided with a floor, where such construction or repair [work] is permanently done," etc., a "division point" is either a place where the division officials of the road are located, or where trains are regularly changed and made up and train crews are regularly changed. (Page 208.)

5. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAW.—The act of May 1, 1905 (Acts 1905, p. 593), which applies only to railroad corporations or persons operating railroads and constructing and repairing railroad equipments, is not rendered unconstitutional by the fact that there are now other persons and corporations in the State who are engaged in the business of constructing and repairing railroad equipments in the State, if there were none such in the State when the act was passed. (Page 210.)

6. MASTER AND SERVANT—RAILROADS—DIVISION POINT.—The fact that some local trains end their runs at a certain place, and that the crews of such trains lay over there to make their return trip, does not constitute it a division point.  (Page 213.)

7. MASTER AND SERVANT—PENAL STATUTE—CONSTRUCTION.—Acts 1905. p. 593, section 1, making it unlawful for any railroad company to repair railroad equipment without maintaining at every division point sheds over the repair tracks for the protection of employees against the weather, other provisions of which statute impose a penalty for its violation, is penal in its nature, and must be strictly construed. (Page 213.)

Appeal from Clark Circuit Court; *George W. Hays,* Judge on exchange; reversed.

*W. V. Tompkins, E. B. Kinsworthy,* and *W. E. Hemingway,* for appellants.

The court should have told the jury what a "division point" is.  63 Ark. 477;  99 Pac. 271;  9 Gill 331;  109 Ill. App. 560. The evidence does not sustain the verdict.  14 Ark. 286;  21 Ark. 370;  23 Ark. 101.  The act is void for uncertainty and indefiniteness with respect to the places to which it applies 27 Fed. Cas. p. 1041; 19 Fed. 679;  52 Fed. 918;  35 Fed. 866; Pet. C. C. 122; 1 Paine 34; Bish. Stat. Crimes 41; Lieb. Herm. 156;  45 Ark. 159;  34 Ark. 224;  35 S. W. 129.  To enforce it would be taking property without due process of law.  35 S. W. 129.  It denies to the owners of railroads the equal protection of the laws. 183 U. S. 79;  194 U. S. 267;  184 U. S. 540;  75 Ark. 542;  86 Ark. 518.

*Hal L. Norwood,* Attorney General, and *W. H. Rector,* Assistant, for appellee.

The act is not void for uncertainty.  86 Ark. 518;  25 Ark. 101;  31 Ark. 701;  Broom's Leg. Max. 247, 248;  3 Bing. 193. Dwarris, Stat. Const. 692; 1 Kent, Com. 162; 15 N. Y. 532; 28 Ark. 200; 2 Pet. 627; 7 Wall. 482;  100 U. S. 239;  40 Ark. 431; 99 N. Y. 43; 20 Ala. 54; 45 Ark. 158.  The enforcement of the act would not deny the defendant the equal protection of the laws.  86 Ark. 518;  194 U. S. 267;  94 U. S. 155;  165 U. S. 649;  *Id.* 150;  174 U. S. 96;  32 L. R. A. 857;  33 *Id.* 319; 207 U. S. 88;  127 U. S. 205;  169 U. S. 385;  120 U. S. 71; 170 U. S. 294;  214 U. S. 91;  81 Ark. 304;  211 U. S. 539;  185 U. S. 203;  25 L. R. A. 759;  26 *Id.* 317;  175 U. S. 348;  203 U. S. 284;  217 U. S. 114;  219 U. S. 453.

FRAUENTHAL, J.  This is an appeal from a conviction of the defendant, St. Louis, Iron Mountain & Southern Railway Company, for the violation of the provisions of an act of the General Assembly approved May 1, 1905, entitled, "An act to provide for the protection of mechanics, laborers and other persons employed in the construction and repair of railroad equipment, and providing a punishment for violation thereof." The section of the act which defines the offense of which the defendant was convicted is as follows:

"Section 1.  It shall be unlawful for any railroad company or corporation, or other persons who own, control or

operate any lines of railroad in the State of Arkansas, to build, construct or repair railroad equipment, without first erecting and maintaining at every division point a building or shed over the repair tracks, same to be provided with a floor, where such construction or repair [work] is permanently done, so as to provide that all men permanently employed in the construction and repair cars, trucks and other railroad equipment, shall be under shelter during snows, sleet, rain and other inclement weather." Acts 1905, p. 593.

The prosecution was instituted before a justice of the peace upon an information which in effect charged that the defendant had on June 15, 1910, repair tracks at Gurdon, which was alleged to be a division point on its line of railroad where repair work was permanently done and men permanently employed in the construction and repair of cars and other railroad equipment, and that it did not have a building or shed over the repair track so as to shelter such employees during snow, sleet, rain and other inclement weather. The trial resulted in a conviction, both before the justice of the peace and in the circuit court, to which an appeal was taken.

It is contended by counsel for defendant that the act is invalid because the term "division point," used therein for the purpose of specifying the place where the building or shed should be erected and maintained, has no well-understood meaning, rendering the act indefinite and uncertain. In this connection, it is urged that the lower court erred in failing to declare to the jury what a division point was and in leaving it for them to decide its meaning by instructing them in effect that they should take into consideration everything in connection with the transaction in order to determine whether or not Gurdon was a division point as contemplated by said act. The interpretation of the language used by the Legislature in its enactments is a matter exclusively for the court, and not for the jury. It is the duty of the court to construe and expound the law, and to instruct the jury definitely as to the interpretation of the statute, for the law must be certain and applied alike to all persons and by all juries. The sole province of the jury is to determine the facts in each particular case, and therefrom to decide whether the law, as announced to them by the court, has been violated. *Kansas City, Ft. S. & M. Ry. Co.* v. *Becker,*

63 Ark. 484.   It therefore became the duty of the trial court in this case to definitely declare what a division point is as used in this statute.   But the failure to so instruct the jury was not prejudicial if, under the undisputed evidence, Gurdon was such a division point.   We are of the opinion that this term "division point," as used in this statute, has a certain and definite meaning.   In determining what the meaning of these words is, we must look to see what is the usual and ordinary interpretation given to them by those using them, and also to consider them in reference to the subject-matter in the mind of the Legislature, as shown by this statute.   "The true sense in which words are used in a statute is to be ascertained generally by taking them in their ordinary and popular signification, or, if they be terms of art, in their technical meaning.   But it is also a cardinal rule of exposition that the intention is to be deduced from the whole, and every part of the statute, taken and compared together—from the words and context, and such construction adopted as will effectuate the intention of the lawmakers."   *Green* v. *Weller*, 32 Miss. 650; Potter's Dwarris on Stat. 197, 201.   The court is presumed to know whether or not these words have a definite signification and what is their exact meaning.   It may seek every source for information as to such meaning, and is not confined to the testimony of any witness who may have given testimony as to his knowledge relative thereto.   For the purpose of considering and advising itself as to the true interpretation of this term, the court may call to its assistance persons who may have information relative thereto, or may apply to any other available source to obtain this information,   But the testimony of any person called to its aid is simply for the purpose of advising the court, and not to give evidence before the jury.   Such testimony or information is solely for the court in aiding it in declaring what the term means and thus to announce what the law is.   Thus in the case of *Louisiana & Ark. Ry. Co.* v. *State*, 85 Ark. 12, it became necessary to determine whether or not a statute requiring a station to be erected at a particular place along the line of railroad was reasonable.   It was there held that the question of the reasonableness of such statute was one of law for the court to determine.   It was determined in that case that the court was not bound by the facts presented or agreed upon by the parties

relative to the reasonableness of having such station erected, but should possess itself of all information obtainable upon the subject, and, for that purpose, might apply to any source which it deemed proper.   And so in the case at bar the court must determine whether the term "division point" has a certain and definite meaning, and what that meaning is.   In order to possess itself of information, it may seek all such available means and sources as it deems proper and, from the information thus acquired, declare what is really within common knowledge. Proceeding in this manner, we know that railroad corporations have departments, officials and employees for the management of their affairs and properties.   A railroad corporation has organized departments to which are intrusted certain duties; amongst these is the duty to provide and keep in proper repair and to operate the equipment which its passenger and freight traffic may require.   In order to effectively conduct and operate its trains, its line of railroad is separated into divisions.   The division is the longest undivided part of its line, and within such division the operation of its trains is managed and supervised by separate and distinct officials, who are known as division officers, with different titles, according to their varied duties.   Within such division, there is a place or point where these officials are located, and such place is known as division headquarters. This is the place where the division officials who manage, control and superintend the operation and repair of trains and equipments which are employed within such division are located.   Such a place is a division point.   But, in considering the use of this term relative to the subject-matter of this statute, we think that it has an additional meaning.   Each division has its beginning and end fixed upon the line of railroad.   At these limits of the divisions, trains are made up and employees operating such trains take charge thereof to make their runs from one end of the division to the other.   At these places, upon the end or beginning of a division, the trains end their runs.   Here engines and cars are inspected and repaired, or taken out of the train altogether, and the train is in effect made up again and either returned upon its trip on the same division or sent on to another division in the course of its run.   Here the employees or crews operating the trains leave them and take their rest preparatory for another run, or the crews of the

trains are here changed.   At the place where this is done regularly and constantly, or substantially so, it is usual that the engines and cars are repaired or new ones constructed.   Such work is also ordinarily done at the place where the division headquarters are located.   These places, then, are division points.   There are also places along the line where incidentally and occasionally local trains end their runs and crews lay over and are changed.   But such places where this is only occasionally and incidentally done do not, we think, constitute division points within the purview of this statute.   Local trains may end their runs, or crews may be incidentally or occasionally changed, at a great many places along the line where there is no permanency or constancy or regularity in such course of operating the trains, but we think it may be inferred from the statute, which provides that the work done must be permanent and the employment of the men permanent at such places, that the Legislature also intended that the places where the trains end their runs and the crews lay over and are changed should be those where this is regularly and constantly done, or substantially so.   The fact that a train is occasionally or incidentally changed at a place, or a local train ends its run at a place on the line, and crews are there occasionally changed, would not constitute such place a division point.   Nor would the fact that at such place a few trains do not change or a few crews do not lay over determine that such a place is not a division point. The features characterizing the place along the line as a division point, within the meaning of this statute, are determined either by the fact that the point is a place where the division officials are located, or by the fact that the place is one where trains are regularly changed and made up, and crews are regularly changed, or substantially so.

It is urged that the act is invalid because it deprives the defendant of the equal protection of the law and thereby contravenes the Fourteenth Amendment of the Constitution of the United States.   This contention is made upon the ground that the act only applies to persons and corporations owning and operating railroads, and thereby makes a classification that is unreasonable and arbitrary.   It is urged that there are other persons and corporations in the State who do not own and operate railroads, but who are engaged in the business of construct-

ing and repairing railroad equipments in the State, and at the trial of this case testimony was introduced proving this fact. The defendant urges that there is no distinction between the character of business done by these other persons and corporations and that which is done by railroad corporations in the repair and construction of railroad equipments, and therefore that there is no reason for excluding these other persons and corporations engaged in a like character of business from the operation of this act while visiting the persons and corporations owning and operating railroads with its exactions and penalties. But we think there is a distinction between the two classes. In the case of the *St. Louis, Iron Mountain & Southern Ry. Co.* v. *State*, 86 Ark. 518, this act was construed to mean that the work must be done at division points constantly, and the men must be there regularly employed. Those who own and operate railroads are not only engaged in constructing and repairing railroad equipments, but they are also engaged in operating trains and transporting property and persons intrusted to their care. The repairs upon or the construction of equipments which they make may be called for quickly while such property is in transit, and the safety of their employees may be better subserved by the protection afforded them in inclement weather which might not apply to those engaged in a like character of business and making similar repairs who have a longer time in which to make them and an opportunity to await better weather in which to make them. In the case of Ex parte *Byles*, 93 Ark. 612, it is said: "Unless the classification be clearly unreasonable and arbitrary and without just distinction as a foundation, the Legislature being primarily the judges of that, it is the duty of the courts to respect and uphold the legislative determination." We think there are other reasons for making the classification, but we do not deem it necessary to further discuss them because we are of the opinion that the constitutionality of this act in this particular has been upheld in the case of the *St. Louis, I. M. & S. Ry. Co.* v. *State, supra.* In that case the prosecution for a violation of this act was before the court, and it was contended that the act was unconstitutional because it made an arbitrary classification and thus violated the equality clause of the Fourteenth Amendment. The court in that case held that the act

was not unconstitutional upon that ground, and said: "The court is unable to find the classification here made offensive to the equality clause of the Constitution as construed by the Supreme Court of the United States, whose decisions are binding on this subject." It is true, the court in that case, in discussing the constitutionality of the act, stated that it was not shown that, as a matter of fact, the law operated only upon one corporation, although others in like and similar condition were not affected by it. But the court also stated that the condition then existing in the State as found by the Legislature was that no other corporations or persons were engaged in such business in the State. That was the condition which existed in the State at that time, and if, since then, the condition is changed, that would not invalidate the law. The statute was passed to meet conditions existing at the time of its enactment; and if the statute was then valid, its validity continued. If conditions have actually changed since this enactment, the Legislature may, in its wisdom, extend the provisions of the statute to other corporations. As was said by this court relative to a somewhat similar contention made in the case of Ex parte *Byles, supra*: "Moreover, the Legislature doubtless made investigation and found that lightning rods, steel stove ranges, clocks, pumps, buggies and carriages are the articles which constitute the stock of peddlers of this day in the State, and the present legislation was designed to meet the conditions which were found to exist. This it was proper and right for the Legislature to do, and the fact that the precise conditions are found not to be met will not invalidate what the Legislature has done." If the act in question was valid when passed upon in 1908, when the opinion was rendered in the case of *St. Louis, I. M. & S. Ry. Co.* v. *State, supra*, it has not been invalidated by reason of any change in conditions which may have occurred since then. The act was then declared to be constitutional, and we see no reason to overrule that decision.

The remaining question to be determined is whether or not the evidence is sufficient to show that Gurdon is a division point. The testimony shows that Gurdon is a station on defendant's line, and that it is not a place where the division headquarters or the division officials are located. The division in which Gurdon is situated is known as the Natchez division,

and its headquarters, where the division officials are located, is at Ferriday, Louisiana. The testimony tended to prove that local trains from Felsenthal and Womble ended their runs at Gurdon, and that there was a day and night crew of these trains there all the time; that the engineer and fireman on the south end "tied up" at this place for the night. But there was no testimony tending to prove that this was a place where the trains were regularly changed or the train crews regularly changed, or substantially so. Local trains only ended their runs at this place, and no train running on the main line in this division ended its run there. The evidence at the most only shows that Gurdon is a place where some local trains end their runs, and where crews only on such trains lay over to make their return trips. This, we think, does not constitute Gurdon a division point, within the purview of this act. This act is penal in its nature, and must therefore be strictly construed. Before a conviction can be had thereunder, it is not only necessary to prove that construction and repair work is constantly done and men regularly employed at this place, but it is also necessary to show that the place is a division point. The evidence does not show this. We are of the opinion that the evidence relative to this question has been fully developed upon the trial in the lower court; and, such evidence failing to show that Gurdon is a division point, it would serve no useful purpose to remand this case for a new trial. The judgment is accordingly reversed, and the case is dismissed.

KIRBY, J., dissents, thinking that proof shows that Gurdon is a division point within the meaning of the act as herein announced.